State v. George.

## STATE v. GEORGE.

1. **Criminal Practice:** CHALLENGE TO JUROR: ERROR WITHOUT PREJUDICE. Where the defendant in a criminal case challenged a juror for cause, and the challenge was overruled, and the defendant afterwards challenged the juror peremptorily, without exhausting all his peremptory challenges, the error, if any, in overruling the challenge for cause, was without prejudice to defendant.

2. ———: ———: QUALIFIED OPINION AS TO GUILT. An opinion of a juror that the defendant is guilty, provided what he (the juror) has heard about the case is true, is not an unqualified opinion, and for the judge so to state during the examination of a juror was not error, nor was it prejudicial to the defendant, where his challenge—the one under consideration—was sustained.

3. ———: GRATUITOUS REMARKS OF JUDGE: NOT COMMENDED, BUT NO GROUND FOR REVERSAL. Certain extended remarks made by the trial judge during the examination of jurors in this cause, pertaining to the intention of the legislature, and the effect of the statute in relation to murder, (see opinion,) while not regarded as being in consonance with the practice in this state, held, under all the circumstances, to have wrought no prejudice to defendant.

4. **Murder:** INSANITY AS A DEFENSE: EVIDENCE CONSIDERED: INFERENCE FROM EPILEPSY. Epilepsy is not necessarily such evidence of insanity as to excuse the subject of it from criminal responsibility; and, upon consideration of all the facts in this case, held that a verdict of guilty of murder in the first degree, and sentence of death, could not properly be set aside by this court on the ground of insanity.

5. ———: INSTRUCTIONS TO JURY: STARE DECISIS. The law as announced in the opinion of this court in *State v. Felter*, 25 Iowa, 67, which assumes to direct the method of instructing a jury in murder cases, has been too long followed and acquiesced in to be now questioned; and the instructions in this case, being in accord with that opinion, are approved.

*Appeal from Polk District Court.*

WEDNESDAY, JANUARY 30.

THE defendant was indicted for murder in the first degree. He was tried, found guilty, and sentenced to death. He appeals to this court for a reversal of the judgment against him.

*Seward Smith,* for appellant.

*Smith McPherson, Attorney-general,* for State.

ROTHROCK, CH. J.—I. The first point in the argument by counsel for the defendant pertains to certain rulings of the court in passing upon challenges to persons called to serve as jurors in the case. An examination of A. G. Groves, a person called as a juror, was had, and he was challenged by the defendant for cause, and the challenge was overruled. It appears, however, that Groves did not serve as a juror, but that defendant challenged him peremptorily, and did not exhaust all of his peremptory challenges. If, therefore, the overruling of the challenge for cause was erroneous, it was error without prejudice. *State v. Elliott,* 45 Iowa, 486; *State v. Davis,* 41 Id., 311; *Barnes v. Town of Newton,* 46 Id., 567.

*1. CRIMINAL practice: challenge to juror: error without prejudice.*

Some objection is made to some remarks of the court defining what is and what is not an unqualified opinion of the guilt or innocence of the defendant. These remarks were made pending the examination of a person called to serve as a juror. We think the definition given by the court was correct. It was to the effect that an opinion that the defendant is guilty or innocent is an unqualified opinion, but that if the opinion is guarded by the conditions that, if what the juror had heard about the case be true, then the defendant is guilty or not guilty, then the opinion is qualified, in the sense that the juror does

*2. ——:——: qualified opinion as to guilt.*

not know whether what he had heard is true or false. No prejudice resulted to the defendant by this remark. The person under examination as a juror was challenged by the defendant for cause, and the challenge was sustained.

W. W. Carpenter and H. Parks, upon their examination as to their qualification as jurors, answered that they had consD conscientious scruples against inflicting capital punishment. The state challenged them for cause, and the defendant objected to the challenge, because it was not by statute made a cause of challenge. The challenge was overruled, and the court thereupon made the following remarks upon the subject:

3. ——: gratuitous remarks by judge: not commended, but no ground for reversal.

"    *    *    *    They may say: 'We, the jury, find F. W. George guilty of murder in the first degree, as charged in the indictment, and determine that he shall be hanged by the neck until he is dead;' or, leaving that out, they may say, 'and determine that he shall be confined in the penitentiary for and during the term of his natural life.' Then, the governor can pardon him out. But if they find him guilty of murder in the second degree, and they send him to the penitentiary for life, then the governor can pardon him out the very same day, if he thinks best.

"When the legislature enacted this statute, it seems to me that they ought to have provided for this emergency. If the court should decide here that this is not a good cause for challenge, the supreme court might reverse it. If he should decide that it is a good cause for challenge, and put the juror off, the supreme court might reverse that. It is in just such a tangle that we would not complain, let them decide it whichever way they would. That is the fix it is in.

"I think that we gather from the statute that, when it is proved to a moral certainty that a person is guilty of murder in the first degree, willful and premeditated killing, especially of an atrocious nature, that it would be well to hang him. I think that is the idea they, the legislature, had.

"I believe the statute ought to provide that it should be

cause for challenge if a man said he was conscientiously opposed to hanging anybody, and that he would not do it for any kind of murder whatever. It ought to be cause for challenge. Now, if we say that the only causes for challenge are those laid down in the statute, then I do not believe that the statute provides for this case. I do say that when they, the legislature, enacted this statute in regard to capital punishment, they should have provided for that, and not having done so is equivalent to saying that no man is to be hanged in this country, no matter how cruel and beastly a murder he may have committed."

It is claimed that the defendant was prejudiced by these remarks.

We are free to say that it would have been better, and more in consonance with our practice, if the court had omitted these remarks. The challenge had been sustained, and that was an end of the matter. What is complained of is not in the nature of an opinion, but seems to be some observations as to what in the judgment of the court was the legislative intent, and what the legislature might have done. The court seemed to think that the legislature had the idea, "when it is proved to a moral certainty that a person is guilty of murder in the first degree, willful and premeditated killing, especially of an atrocious nature, that it would be well to hang him." It cannot be doubted that the statute authorizes the infliction of the death penalty.

But, however the jury may have regarded the remarks last above quoted, the closing part of what was said by the court was favorable to the defendant, because it is there stated that the legislature have said, in effect, that "no man is to be hanged in this country, no matter how cruel and beastly a murder he may have committed." And the court in its instructions to the jury used this language: "It is your duty as jurors to try and determine this case according to the evidence produced and submitted to you in open court on this trial, and the law as given to you by the court in these instructions, and upon nothing else."

We conclude, under these circumstances, and considering the fact that the remarks complained of were made before the jury was made up and impaneled, and were not addressed to the jury or intended for their consideration, that the defendant was not prejudiced thereby. If the remarks were heard by any of the persons who served upon the jury, their tendency would rather be to create the impression that the state of the law was such that the death penalty could not be inflicted.

One Thomas French was a juror who served in the trial of the case. It is claimed that, in his examination as to his qualifications as a juror, he deceived the court and counsel by false answers to questions as to his knowledge of the defendant and of the alleged crime. This was one of the grounds of the motion for a new trial, and certain affidavits were filed in behalf of the defendant, and the juror was called and examined under oath touching the matter.

We need not set out the affidavits, or the other evidence taken upon this branch of the case. It is sufficient to say that we think the court did not err in overruling the motion on this ground. We are not prepared to say that the juror did not fully explain all the charges against him, and exculpate himself from any wrong.

II.    We come now to the principal question in the case. The defendant claimed upon the trial that he should be excused for the homicide, upon the ground of insanity. And here it is proper that we should give a statement of the facts attendant upon the alleged crime. The defendant at the time of the homicide had been married about twelve years, and had a wife and five children, then residing in Des Moines. He left his family at Altoona on the twenty-third of December, 1880, and remained away until the latter part of February, when he returned, and remained at home until some time in May, when he again left, and was not at home at all after that, except on two or three occasions, and then only for a

4. MURDER: insanity as a defense: evidence considered: inference from epilepsy.

short time—at one time half a day, at other times but a few minutes. In April, 1881, the family removed from Altoona to Des Moines. On the twenty-fourth of June, 1881, the defendant went to the home of one Hockersmith, with a woman named Martin, whom he represented to be his wife, and who was far advanced in pregnancy. He obtained boarding with Hockersmith for himself and the woman, and they remained there three nights and three days, and occupied the same room and bed. After leaving there, he took the woman to the home of one Anderson, where she remained two weeks and a few days. Some two or three days after going there, the defendant called on the woman, and was forbidden further visits. The woman was sent away from this place by Mrs. Anderson. The defendant stated to one witness, to whom he applied for boarding for the woman, that she came from Monroe, that she had been in the city only a few days, and that he was acting as her friend.

About July 20, John Epps took the woman to the house of Mrs. Bunce, and left her there, saying he would pay for her board. John Epps was a man some fifty-two years of age. He kept a barber shop, and made some claim to be a physician, and was called Dr. Epps. So far as appears, he and the defendant had been on terms of friendship, and the defendant had been taking medicine which was prescribed by Epps. On Saturday, the twenty-third day of July, 1881, the defendant was armed with a revolver, and declared to several persons his intention to kill Epps, because he (Epps) was going to produce an abortion upon the woman named Martin; that her father on his death-bed made him promise to protect her, and he was going to do it. On Sunday morning, the twenty-fourth of July, the defendant went to the house of Mrs. Bunce, and he was refused admittance. He engaged in conversation with a person who was sitting at an open window in an adjoining house. In this conversation he inquired if Epps had been at Mrs. Bunce's that morning, and was advised that he had been. He declared his purpose

to shoot Epps, because he was going to perform an abortion upon the woman named Martin. While engaged in this conversation, Epps came down the street, and the defendant stepped out on the sidewalk and asked him where he was going. Epps replied that he was going to Mrs. Bunce's. The defendant told him he should not go there—that he would shoot him—that he should not perform the abortion —that he would take his life first. He drew his revolver, and Epps ran across the street, the defendant following him, and, as they ran, the defendant shot Epps twice. The last shot pierced his heart, and he fell and died in five minutes. After he fell, the defendant stood over him and snapped his pistol at his heart. After the shooting, the defendant ran and attempted to escape, but was captured several squares away, and put in jail. The foregoing facts attending the homicide are not in dispute. They are but a plain, unvarnished statement of the evidence in the case, to which there is nothing in conflict or contradiction. If the defendant was of sound mind, and legally responsible for his acts, he was guilty of murder in the first degree. There was the intent to kill, the deliberation and premeditation, and all the elements necessary to constitute that crime.

The evidence upon the question of insanity is voluminous. Some forty witnesses testified for the defendant upon this point. We cannot set out the evidence in detail in an opinion. There is one fact, however, upon which all of the evidence is in accord, and that is, that for some time before the homicide the defendant had been afflicted with epilepsy. It appears that his mother's sister was in her lifetime subject to the same disease, and the father of the defendant has two nephews who are insane. It is not quite certain when the defendant was first affected in this way. His father states that the first he heard of it was three or four years before the trial in the court below, which was in April, 1882. The wife of the defendant testified that the disease commenced in March, 1879, which was some three years before

the trial. Other witnesses fix the time somewhat further back; but it is safe to say that he was not troubled in this way more than four years prior to the trial in the court below. It does not appear that the convulsions occurred at regular intervals, and at times they were merely momentary, and at other times continued for some time. Before and after the principal attacks, the witnesses for the defendant all concur in stating that his language was incoherent, showing that his mind was affected, and he labored under mental delusions, and had a wild and unnatural expression of the eyes. And some of these witnesses stated that on the day before the homicide, and in the evening of that day, he manifested these peculiarities.

But it appears quite evident from the testimony of these witnesses that there were times when the defendant was sane and rational. Dr. Kennedy, who was county physician for part of the time that defendant was confined in the jail, and who attended him professionally, while expressing the opinion that at times defendant was insane, did not state it as his belief that he was insane at all times. In answer to a question put by a juror, this witness stated that a large part of the time he regarded him as responsible for any crime that he might commit, but that he did not know how soon that condition might change.

On the other hand, a number of witnesses who were acquainted with defendant, and also saw him on the day of the homicide and the day before, testify that they saw nothing peculiar in his acts, declarations, or conduct. And it does not appear that there were any unusual manifestations on his part when he was arrested and put in jail. And the evidence does not show that he had any attack of epilepsy within a short time before the day of the homicide. And it does not appear that he was thus afflicted for some two weeks after he was confined in jail.

It is not claimed that epilepsy is necessarily such evidence of insanity as to excuse the subject of it from criminal re-

sponsibility. Common observation teaches that there are persons afflicted with this disease who at intervals between the convulsions are perfectly sane and rational. In Vol. I, Sec. 472, of Wharton & Stille's Medical Jurisprudence, it is said: "It will be pecularily necessary here to make a division between the several classes of epileptic diseases. The infirmity is well known to appear in very different degrees of intensity under different circumstances, and, as it arises from different physical causes, it may be considered as exerting different retroactive influences on the mind and the body. It may affect the intellectual faculties in a very subordinate degree, as the cases of Cæsar, Napoleon and Mohammed sufficiently prove. The doctrine, therefore, results, that in general epilepsy the usual presumption of responsibility applies to acts committed in the intervals between one attack and another."

We are asked to set aside the verdict and reverse the judgment of the district court in sustaining the verdict, upon the ground that the evidence shows that defendant was not criminally responsible for the homicide by reason of insanity. A full, fair and candid examination of the record leads us to the conclusion that we cannot do so. If it were not that the defendant is condemned to death, we do not believe we would be asked to do so. We think the evidence very clearly shows that at times the defendant was sane and responsible, and it was for the jury to determine whether or not he was in that condition of mind when he took the life of his victim; and upon that question we cannot say that the verdict is wrong.

III.  Complaint is made of the instructions given by the court to the jury. It is said that they "are heavily draped in favor of the state, and that the charities of the law are not made so conspicuous as the defendant had a right to expect or demand." Objection is made to certain expressions and phrases in the instructions, which are said to be prejudicial.

5. ———: instructions to jury: stare decisis.

The instructions are in full accord with the opinion in *State v. Felter*, 25 Iowa, 67, which assumes to direct the method of instructing a jury in cases of this character. The law as there announced has been too long followed and acquiesced in to be now questioned.

AFFIRMED.