## FRANK V. LARSON v. STATE OF NEBRASKA.

FILED SEPTEMBER 28, 1912.    No. 17,490.

1. **Criminal Law:** TRIAL: SANITY OF ACCUSED: QUESTION FOR JURY. When the contested issue in a criminal case is as to the mental condition of the defendant as affecting his responsibility for his act, that issue is to be determined by the jury; it is not a question for the court. ·

2. ———: ———: ———: NONEXPERT WITNESS. One not an expert is not allowed to testify to his opinion of the sanity or insanity of the defendant without first showing such knowledge of the defendant as would enable him to form an opinion.

3. **Quaere.** Whether a physician and surgeon who has treated the defendant in his professional ˙capacity on various occasions for several years, and has also seen and conversed with him occasionally unprofessionally, and . who testifies that he can give his opinion as to defendant's sanity based solely upon his knowledge of him derived unprofessionally, can be allowed to state that opinion when objected to by defendant on the ground of privilege under the statute—*quære.*

4. **Criminal Law:** TRIAL: SANITY OF ACCUSED: EXPERT EVIDENCE. If an expert witness fails to testify to the facts and conditions which he has observed upon which to form an opinion as to the sanity or insanity of the defendant, or that what he had observed was sufficient to enable him to form an expert opinion, it is erroneous to allow him to testify that he has not observed anything that led him to the conclusion that the defendant was insane.

5. ———: WITNESSES: PRIVILEGED COMMUNICATIONS: WAIVER. The defendant, without objection, answered questions of the prosecuting attorney upon cross-examination relating to treatment of defendant by his physician and the physician's opinion of his condition. *Held,* That by so doing he did not waive his privilege to object that the physician could not as a witness for the state testify to confidential communications between them.

6. ———: TRIAL: ADMISSION OF WRITING: HARMLESS ERROR. It is erroneous to allow a writing in evidence as the writing of the defendant without proof of his signature or otherwise identifying it as written or authorized by him. But, if the substance of the writing is testified to by defendant and otherwise clearly proved without conflict, the error is without prejudice.

7. ———: ———: INSTRUCTIONS. An instruction that, if the state
has failed to establish "each and every" of the material allega-
tions beyond a reasonable doubt, the jury must acquit, is not
prejudicially erroneous, because of the use of the words "each
and every" instead of the word "any."

ERROR to the district court for Burt county: GEORGE A.
DAY, JUDGE. *Reversed.*

*J. A. Singhaus* and *Smyth, Smith & Schall,* for plaintiff
in error.

*Grant G. Martin, Attorney General,* and *Frank E.
Edgerton, contra.*

SEDGWICK, J.

In October, 1911, the defendant killed his brother,
Charles Larson, by shooting him in the head. The defend-
ant was convicted of murder in the first degree in the dis-
trict court for Burt county and sentenced to imprisonment
in the penitentiary for life. He has brought the case here
for review upon petition in error.

There is no dispute as to the principal facts in the case.
The question is as to the mental condition of the defend-
ant and his responsibility for the act. The defendant is a
small man, was in poor health and very hard of hearing,
so that it was necessary to use an ear trumpet in ordinary
conversation. For many months there had been criminal
relations of intimacy between the defendant's brother,
Charles, and the defendant's wife. The defendant had
suspected these relations for some time, and had at
various times questioned his wife closely in regard to the
matter, but she had continually denied that there were
any improper relations between them. About the first of
October she confessed to her husband that his brother
Charles had attempted to take undue liberties with her,
but insisted that it had not gone to extreme criminal rela-
tions. She seems to have fully repented of her part in the
transaction, and had fully resolved to do everything in her

power to conciliate her husband and repair the injury she had done him. In explaining the conduct of Charles in answer to the defendant's questions, she was finally led to admit that the matter had gone much further than she had at first stated. She declared that she was unable to talk about it, and proposed to write the full statement of what had taken place, which she thereupon did, and gave it to her husband. This statement showed the criminal relations that had existed for some time, and the defendant insisted that they both must withdraw from the church of which they were members, and that they could not live together, and that she must leave their home. This she consented to do, and consented to do anything that her husband desired, but when she left her home, in pursuance of this arrangement, he followed her in the interest, as he said, of their children, and requested that she return, at least for the present, until suitable arrangements could be made. She thereupon returned. There was also evidence that the defendant was very much attached to his wife and children (there were six children, ranging from two to fourteen years of age); and that, when he became aware of the full enormity of his brother's conduct, he was entirely overcome and was wholly undecided what to do; that at times he contemplated taking his own life, and that he had taken his gun from the house to the shed, mentioned below, for that purpose, and was then only deterred from taking his life by his young son who found him and urged him to return to the house; that at other times he contemplated driving his wife from their home, and was partly impressed with the idea that his brother would be compelled to leave the country, and that some suitable arrangements could be made for the future care of the children.

If the defendant is found guilty, a very important question is presented as to the degree of his guilt. If he was in a state of mind to be responsible for his conduct and planned beforehand to induce his brother to come within his power for the purpose of taking his life, as might pos-

sibly be inferred from some of the statements that he made, as testified to by certain witnesses, and if he succeeded in that attempt and did take his brother's life as he intended, he was guilty of murder in the first degree. If, on the other hand, he was laboring under such mental strain and excitement that he was incapable of forming a deliberate plan, and expected that his brother would leave the community where they lived, and did not have any intention of using his shotgun upon his brother, but in doing so acted upon a sudden impulse, arising from his troubles, the conversation between them and his brother's insulting behavior, and the defendant was at the time in such use of his reasoning powers as to be responsible for his act, then he was guilty of manslaughter. The question of the degree of his guilt does not appear to have been very fully presented to the jury.

The defendant induced his brother to come to the defendant's place, without first informing him of the knowledge which he had of the existing conditions, and when his brother arrived the defendant took him to a small shed where the defendant had placed his double-barrel shotgun, and, after closing the door, took his shotgun in his hands and asked his brother if he knew why he called him there. He had represented that he had called him there for the purpose of helping him with some of his calves. When the defendant acknowledged that he called him there because of his relations with the defendant's wife, and inquired what he, Charles, was going to do about it, on being asked what he, the defendant, wanted him to do, the defendant told him that he wanted him to leave the country and never show himself in that part of the country again. This Charles refused to do, but said that he would agree to never come again to the defendant's place. This was not satisfactory to the defendant, and the defendant testified that he then showed Charles the statement which the defendant's wife had written and proposed that they call her. They both then left the shed, the defendant carrying his gun. There is evidence that the defendant afterwards

stated to several witnesses that when his wife came to them she inquired of him: "Can't this be settled * * * will you take money?" He laughed and said: "Yes." "Will you take $10,000?" she asked. He answered: "Yes." The defendant, upon the witness-stand, testified that he there said to them: "You need not think that I want any of your dirty money." If he answered as these witnesses testified that he stated out of court he did, that $10,000 would adjust it, it might be construed that he was seeking to get money from his brother, or it might be construed that he considered the sum named so far beyond the reach of either or both of them that it amounted to a declaration that the money settlement was out of the question. However that may be, it would appear from the evidence of the defendant and his wife, and also from the statements which the defendant is alleged to have made out of court, that his brother Charles then began to treat the matter lightly, and sneeringly accused the defendant of calling him over there to get money out of him, and finally said: "Shoot, why don't you shoot?" Thereupon, the defendant did shoot, and killed him instantly.

The theory of the defense is that the defendant was so exasperated by existing conditions, and the conduct of his brother at the time, that he was unable to control himself, and was not responsible for his act nor able to distinguish between right and wrong with reference to what he did. This presents the question as to the mental condition of the defendant at the time of the act, a matter always difficult to determine, and particularly so in this case, a question not for the court, but peculiarly one for the jury. If that question has been submitted to the jury without violating the substantial rights of the defendant, their verdict must be regarded as final; it cannot be interfered with by the court. The defendant called an expert witness, a member of the medical profession and of apparently good standing, who has had experience in treating diseases of the mind and had thoroughly examined the defendant. In answer to a hypothetical question which

substantially recited the facts as testified to by the defendant and his witnesses, including evidence showing that the defendant from the time that he learned of these criminal relations between his brother and his wife was so affected mentally and physically that he was unable to perform his regular duties or even to control his own conduct and conversation, this witness testified that, in his opinion, the defendant was irresponsible at the time and was unable to distinguish between right and wrong with reference to the act which he did. In rebuttal the state produced Dr. Hildreth as a witness, who had for some time, perhaps four or five years, been the family physician of the defendant, and who had in that capacity on various occasions treated the defendant himself, and questioned him as to defendant's sanity. The defendant's counsel duly objected to the calling of this witness, on the ground that he was the defendant's physician and the information that he gained in that capacity was privileged.

1. The attorneys for the state insist that the defendant waived this privilege by answering upon his cross-examination various questions in regard to Dr. Hildreth's examination and treatment of him. Some decisions are cited which appear to hold, as maintained by Professor Wigmore, that if the person entitled to the privilege introduces evidence in regard to his physical condition at the time, it is competent to call his physician to rebut that testimony. Professor Wigmore says: "Certainly it is a spectacle fit to increase the laymen's traditional contempt for the chicanery of the law, when a plaintiff describes at length to the jury and a crowded court-room the details of his supposed ailment and then neatly suppresses the available proof of his falsities by wielding a weapon nominally termed a privilege." 4 Wigmore, Evidence, sec. 2389. He says, however: "This is generally not conceded in the judicial rulings." . Sec. 2390. He appears to derive his conclusion from his reasoning, and not from the language of the statute. He is discussing what the statute ought to be, and not what it really is. Sec-

tion 333 of the code is as follows: "No practicing attorney, counselor, physician, surgeon, minister of the gospel, or priest of any denomination shall be allowed, in giving testimony, to disclose any confidential communication, properly intrusted to him in ·his professional capacity, and necessary and proper to enable him to discharge the functions of his office according to the usual course of practice or discipline." The provision that "no * * * physician * * * shall be allowed, in giving testimony, to disclose any confidential communication," appears to be absolute, and it is doubtful whether the next section, which provides that this privilege shall not obtain where·the party "waives the right thereby conferred," was intended to prevent a party from testifying to his physical condition, without at·the same time consenting that his physician may at any time reveal his confidential communications. The question is an important one and is a question of construction of the intention of the legislature. If it is wise to introduce such an innovation into our law, it would seem to be the province of the legislature to do so. The ground upon which this waiver in this case is urged by the state is a little different from that stated by Mr. Wigmore, and perhaps a little more substantial. It is said that the defendant himself gave testimony of Dr. Hildreth's examination and treatment. If the defendant had offered these matters as evidence in his own behalf, the position of the state would be unassailable. He did not, however, do so. These matters were drawn from him by the state's attorney on cross-examination and only in answer to direct questions. It seems clear that the state ought not to be allowed to compel the witness to waive his privilege in this manner. It is said that the witness was not compelled to answer these questions, but might then have insisted upon his privilege; but this suggestion does not answer the objection. If the defendant's privilege would extend so far as to exempt him from cross-examination as to conversations and transactions he had had with others, including his physician, ·the state

ought not now to be allowed to urge that fact after having introduced the evidence which assumed that the defendant was compelled to answer.

2. The witness was asked this question by the state: "Doctor, based on your observations and your conversations and the different matters that you have detailed here that took place and which you have stated here which took place other than in a professional way, I will ask you, in your opinion, whether or not the defendant on that 3d day of October, 1911—what his condition was as to being sane or insane?" Defendant then was allowed to cross-examine the witness as to his qualifications, from which it appeared that the witness had been the family physician for the family of the defendant, and had treated the defendant personally in that capacity during the several years last past, and the witness stated that, if he gave him an opinion as to his mental condition, it would be based in part on what he saw of him on that day of the tragedy and what he had known of him for years, and in part on the knowledge of what he had acquired respecting him which he had acquired while waiting on him as his family physician. After the cross-examination of Dr. Hildreth, the state propounded to him this question: "You can separate the conclusions which you drew from your professional calls * * * and your observations that day? You can give an opinion on that alone?" He answered: "I can." He was then asked: "Doctor, based on your observations and your conversations and the different matters that you have detailed here that took place and which you have stated here which took place other than in a professional way, I will ask you, in your opinion, whether or not the defendant on that 3d day of October, 1911—what his condition was as to being sane or insane?" The objection interposed, that the question was leading and called for a privileged communication and the witness is incompetent, was overruled. The witness then inquired: "I am to base my answer on observations outside of my professional capacity?" The state's attorney stated:

"Yes, sir; not to use any knowledge you acquired in a professional occupation. This question refers to that day —on the 3d day of October, 1911." The witness then gave his answer to the question as follows: "I have never seen any time that I have known Frank Larson but that I had any question as to his mental competency." On motion this was stricken out as not responsive to the question. The question was repeated, and the witness answered it as follows: "I saw nothing to indicate to me but what he was competent and sane." A motion to strike out this answer because it was incompetent, irrelevant and immaterial, and no proper foundation was laid for it, and it called for a privileged communication, and that the witness was incompetent, was overruled, and to this ruling the defendant excepted.

Under the conditions of this case as it then appeared to the jury, the evidence of this witness must have been regarded by the jury as of great importance. The witness had been the family physician of the defendant, and on the day of the defendant's arrest the defendant and his wife went into the office of the witness, and in the presence of the witness discussed the conditions that confronted them, apparently relying upon the relation that had existed between the witness and the defendant; the witness had not stated what circumstances and conditions he relied upon in forming his opinion, and the court had upon careful consideration decided in the presence of the jury that the evidence was proper, so that the jury would naturally rely upon the conclusions reached by the witness. If the evidence was properly received, it must be because the witness was qualified as an expert, because as a nonexpert his evidence was clearly incompetent under well-established rules in such cases. He made no attempt to relate to the jury the facts and circumstances and conditions upon which he based his opinion, and his testimony does not show sufficient familiarity with defendant to give any real value to his opinion.

Many courts have held that such evidence would be in-

competent on account of the relationship existing between the witness and the defendant. It has been many times said by the courts that the human mind is not competent to separate the facts of which it is cognizant into two classes—those that were obtained professionally and those facts coming within the observation of the witness not so obtained—and distinguish an opinion derived from one series of facts from an opinion derived from another. It has been suggested by some that the witness might not be competent to determine as a matter of law how far the rule of personal privilege extends, and so be able to determine what facts the law would regard as having come to him through his professional capacity. The line of questioning here seems to require the witness himself to determine these questions, and it may well be considered difficult, if not impossible, for him to do so.

However that may be, we think the evidence was incompetent for another reason. The question propounded to him did not suggest anything in regard to the defendant's situation, nor in regard to his mental condition preceding or at the time of the tragedy. If he confined himself to what he himself had observed in a social way and in casually meeting defendant, as he assumed to do, his answer would not take into consideration the most material part of existing conditions. His answers show clearly that he did not consider that he was sufficiently informed in regard to existing conditions to give a valuable opinion on the questions propounded. He does not say what his opinion as an expert would be, but says that from these casual observations of the defendant he did not see anything that would lead him to the conclusion that the defendant was insane. The jury had no means of knowing what or how much the witness had seen unprofessionally that would be of any value in determining the question. So far as his answer to the question goes, he may not have observed and remembered enough to enable him to come to any conclusion upon the question. When he was asked if he could give an opinion as to defendant's

sanity or insanity, based upon matters that came to his knowledge "other than in a professional way," he answered: "As far as that observation would go outside of my professional capacity I could. * * * I should have to have an opinion; I should have to have an opinion separate." Why would he "have to have an opinion"? Surely he would not be obliged to have an opinion as an expert without sufficient data from which to form it. His answer implies that he did not consider that his "observation * * * outside of my professional capacity" was sufficient upon which to form an expert opinion. The opinion he formed from this observation was simply the tentative opinion of the average citizen who has heard or seen only a part of the facts or transactions, and feels constrained to make a guess. He testified that during the year then last past he had seen the defendant "possibly three or four times a month. * * * It would be a very uncertain and indefinite opinion. I could not say how often I saw him." He was allowed to testify, not what his opinion was as to the sanity or insanity of defendant, but that he had not observed enough to lead him to the conclusion that the defendant was insane. This evidence we think was incompetent, and was plainly very prejudicial to the defendant.

3. It is insisted upon behalf of the defendant that the court erred in allowing the daughter of the deceased to testify to the contents of a postal card received by him. It was assumed in the question that the postal card came from the defendant, and the witness testified, over the objections of defendant, that the substance of the card was a request to the deceased to "come over in the morning and help me with the calves." There was no evidence that this card was written by the defendant. The handwriting had not been identified, and it was error to receive it in evidence. This error was clearly without prejudice to the defendant. The defendant himself, upon the witness-stand, testified that he sent this postal card to the deceased, and himself stated the contents of the card substantially as stated by the witness, and there was no ques-

tion in the case but that deceased came to defendant's place in answer to this card and other similar requests over the telephone. Surely the defendant cannot now urge that he was prejudiced by the evidence complained of.

4. In the eighth instruction given to the jury, after reciting the facts necessary to be proved in order to find the defendant guilty of murder in the first degree, the court told the jury: "If, however, the state has failed to establish each and every of the above and foregoing propositions beyond a reasonable doubt, then you should acquit the defendant of the charge of murder in the first degree." It is said that the law is that, if the state has failed to establish any one of the necessary propositions beyond a reasonable doubt, he should be acquitted. We fail to understand the reasoning of defendant's attorney in regard to this instruction, and cannot see that the instruction as given by the court was erroneous. The same objection appears to be urged to the court's instruction in regard to the crime of murder in the second degree and in regard to the crime of manslaughter.

5. In the fourteenth instruction the court, after defining the defense of insanity, uses this language: "If upon consideration of the whole testimony you are satisfied beyond a reasonable doubt that at the time of the alleged shooting the defendant was sane, then you should find against him on the issue of his insanity." It is urged that the court should have said that, unless they were so satisfied, they should find the defendant not guilty, and not merely inform the jury that they should find for or against him on the issue of insanity. There might be some merit in this objection if it were not for the fact that in several other instructions the court plainly told the jury that, unless they found beyond a reasonable doubt that the defendant was sane at the time of the shooting, they must find him not guilty. Taking the whole instruction together upon this point, the jury could not have been misled.

6. Several of the defendant's requests for instructions were refused, and this is now complained of. On examination we find that the instructions given by the court upon its own motion contained all of these matters that the defendant was entitled to and were necessary to a proper understanding of the facts presented in evidence.

7. Upon the trial the prosecutor produced the hat worn by the deceased at the time of the shooting. There is no controversy in the case as to the action of the defendant nor as to the death of the deceased. This exhibition of the torn and blood-stained hat would have no purpose except to arouse the passion of the jurors. When, however, it was offered in evidence and objected to, the offer was withdrawn, and it was not put in evidence. If this evidence had been received over the objection of the defendant, it might have constituted reversible error, as held in *McKay v. State,* 91 Neb. 281. If the prosecuting attorney, knowing that such evidence was incompetent, had purposely exhibited the hat to the jury with the intention of thereby prejudicing them against the defendant, it might have constituted such misconduct as to have required a reversal, but we do not find evidence in the case justifying the conclusion that the prosecuting attorney was in this case guilty of such misconduct.

Other questions discussed will not probably arise upon another trial.

The judgment of the district court is reversed and the cause remanded for further proceedings.

REVERSED.

LETTON, J.

I think the defendant is entitled to a new trial on other grounds; therefore I concur in the conclusion only.

FAWCETT, J., concurring.

I concur in the judgment of reversal, but not upon the grounds assigned in the opinion. I prefer to base my conclusion upon the ground that defendant has not had an

unprejudiced trial. He had been grievously wronged. His home had been invaded and ruined by one who by every tie of kindred should have been ready to fight, if need be, in its defense, and for its sacred preservation. When the destroyer was confronted by his hapless victim, instead of humbly imploring forgiveness, he met his just accuser with taunting language which I do not think one man in a hundred, under the circumstances, could have resisted. I am not defending the "unwritten law." But I am not willing to hold that the killing of a man under the circumstances shown in this case is murder in the first degree. To hold that it is a greater crime than manslaughter is to shut our eyes to the laws of nature and the irresistible inborn tendencies of man. That the jury found the defendant guilty of murder in the first degree forces the conclusion in my mind that they were either influenced by prejudice, or did not fully comprehend their duties as outlined in the instructions of the court. In either case the defendant should be given the opportunity of presenting his cause to another jury.

ROSE, J., dissenting.

My understanding of the evidence and of the law applicable thereto is radically different from that of the majority. Defendant shot and killed his brother, October 3, 1911. This fact cannot be successfully controverted, and there is no attempt to do so. Unless the jury could have found from the evidence that defendant, at the time of the homicide, was insane within the meaning of the criminal law, there was no justification whatever for a verdict of acquittal. After defendant had adduced testimony tending to show he was insane, the state called in rebuttal Dr. Hildreth, who answered a question as follows: "I saw nothing to indicate to me but what he was competent and sane." The refusal of the trial court to strike this answer out of the record on motion of defendant is, according to the opinion, an error; and a reason given for setting aside the verdict of the jury is as fol-

lows: "This evidence we think was incompetent, and was plainly very prejudicial to the defendant." The majority neither hold that the answer quoted was incompetent, nor that Dr. Hildreth was an incompetent witness, because his testimony violated the statute forbidding the disclosure of privileged communications. In testing the competency of his answer from the standpoint of the majority, therefore, his professional capacity must be considered in connection with other proofs. The following facts are proved: Dr. Hildreth was a graduate of Rush Medical College, Chicago. He was a duly licensed physician. He had been practicing his profession in the vicinity of the homicide for 31 years. He had known defendant about 15 years, and had been fairly well acquainted with him for 5 years; saw him a great deal not in a professional way—possibly three or four times a month. Saw him in town; saw him frequently when he was not attending him professionally. In a room adjoining Dr. Hildreth's office an inquest was held the day of the homicide. Defendant was there. For two hours he was closely observed by Dr. Hildreth, who heard him talking and answering questions, and observed the tone of his voice and his manner of speech. Dr. Hildreth testified, in substance, that he observed defendant's general conditions, and he told what they were, and that he had heard a conversation between defendant and his wife, and he stated the substance of it. Later in his examination the witness was asked: "You can separate the conclusions which you drew from your professional calls on him, and from knowledge which you had of him, and acquaintance with him formed outside of your professional calls, and your observations that day? You can give an opinion on that alone?" The answer was: "I can." He was also asked: "Doctor, based on your observations and your conversations and the different matters that you have detailed here that took place and which you have stated here which took place other than in a professional way, I will ask you, in your opinion, whether or not the defendant on that 3d day of October, 1911—what his con-

dition was as to being sane or insane?" The question was answered: "I saw nothing to indicate to me but what he was competent and sane." The clear import of the testimony of Dr. Hildreth is that an opinion as to defendant's sanity was forced upon him by observed conditions and facts. The record, therefore, answers the question: "Why would he 'have to have an opinion'"? When the existing facts and conditions were impressed on his mind by observations, the mental operations resulting in the opinion that nothing was disclosed to indicate insanity were neither unnatural nor suspicious. The testimony condemned by the majority, if considered as the evidence of a nonexpert witness, is clearly competent, unless a former opinion of this court is overruled. *In re Estate of Wilson*, 78 Neb. 758. Considered as expert evidence of a physician not disqualified as a witness, the testimony criticised by the majority is competent under well-established rules. The contrary holding, under the facts as they exist, will, in my opinion, introduce into the criminal law of the state a new technicality which will prove to be confusing to the courts as well as dangerous to society. I do not think any sufficient reason for setting aside the judgment has been suggested in the opinion of the majority.