STATE OF IOWA, Appellee, v. ELMER BREWER, Appellant.

No. 42093.

MAY 15, 1934.

REHEARING. DENIED JANUARY 10, 1935.

John L. McCartney and Herbert A Greenhaus, and James W. Fay, for appellant.

Edward L. O'Connor, Attorney-general, Walter F. Maley, Assistant Attorney-general, and John W. Gwynne, County Attorney, and Burr Towne, Assistant County Attorney, for appellee.

CLAUSSEN, C. J.—On the afternoon of December 16, 1932, appellant, Elmer Brewer, and Pat Griffin were in a small house in the

outskirts of Waterloo, Black Hawk county, Iowa. For some reason or other the sheriff of the county desired to apprehend Brewer. H. M. Mitchell and William E. Dilworth, deputy sheriffs, went to the house in search of Brewer. The house was a small one consisting of two rooms. At the time the officers approached the house, Brewer was asleep on a cot or small bed in the living room. Griffin was also in the living room. When the approach of the officers was observed, Griffin awakened Brewer, and he and Brewer went into the other room. Brewer had covered himself while asleep in the living room with his overcoat. He had a pistol in his overcoat pocket. When he arose from the bed, his pistol fell from the overcoat pocket. He picked it up and put it back in the overcoat pocket. He took the overcoat with him into the side room. The opening between the living room and the side room was closed by a piece of wallboard rather than by a door. The officers entered the living room and inquired whether Brewer was there. The lady of the house denied that Brewer was in the house, whereupon the officers asked permission to search the adjoining room. Thereupon the wallboard closing the door was jerked aside and Griffin and Brewer leaped into the living room commanding the officers to put up their hands and immediately opening fire upon them. Both of the officers were wounded. Mitchell recovered from his injuries, but Dilworth died. Dilworth was shot through the head, and died as a result of such wound. A county attorney's true information was filed charging Brewer and Griffin with the crime of murder in the first degree. Brewer asked and was granted a separate trial. On the 27th day of December, 1932, the trial of the charge against Brewer was commenced. The jury found the defendant guilty of murder in the first degree and directed that he be punished by death. Judgment was pronounced accordingly. From such judgment this appeal is prosecuted.

In the beginning the defendant entered a plea of not guilty. During the progress of the trial the defendant asked, and was granted leave, to introduce the defense that he was insane at the time the act was committed. To sustain such special defense the defendant testified that some years ago he suffered from a very severe sunstroke; that the attack was of such severity that he was taken in custody and detained over night on account of being out of his head. He testified that when he became heated he could not think or remember things as he could before; that when he is in a hot room it seems

to smother him and frequently produces headaches; that he had been out of his head subsequent to the heat attack; and that the trouble came on him often and more severely when he was worried. His former wife testified to his condition at the time of the sunstroke. She stated that her husband was brought home about 2 o'clock in the afternoon and was put to bed, where he remained until about 4 o'clock, when he got out of bed, evidently violently disturbed, and ran away. She had the officers locate him, and states that the officers kept him in custody for two days. She testified that subsequent to the sunstroke, her husband, on occasion, would threaten to take his own life and the life of his children. From her version of the condition of the defendant and the testimony of former neighbors of the defendant it is conclusively established that when the defendant was under such seizures he was very violent in temper and in action. Both the defendant and his former wife associated the seizures with the defendant working in the hot sun or being in a very warm and poorly ventilated room, although, as has been noted, the defendant testified, as did the wife, that worry had some connection with the difficulty.

In addition to the foregoing facts, the record discloses that at about 4 o'clock in the morning of December 16, the date of the crime, the defendant came to the home of his former wife, for the purpose, so she testified, of procuring his overcoat and saying good-bye to his children. Testifying concerning his actions and appearance at that time, the former wife said: "From my knowledge and acquaintanceship with Mr. Brewer, the way he acted was not natural. Everything wasn't just right and it seems to me as though he was worried about something by the way he acted."

Brewer's codefendant, Griffin, testified upon the trial. Griffin testified that Brewer had been absent-minded, or rather forgetful, for some time; that the night before the crime was committed Brewer acted and looked differently than he normally did; that on the night when Brewer left he was not supposed to return, but that he did return "and wanted to know what he was going to do, and what was the matter and a bunch of foolish questions like that". Griffin testified that, when he and Brewer left the house, in which they had just wounded one man and killed another, Brewer did not appear as he would naturally. It is in evidence that there were two stoves in the room; that Brewer carried in some wood from outdoors and put some of it in one of the stoves; that Brewer had been sleeping

on a cot of some kind near this stove, and that he was covered with his overcoat while he slept. The crime was committed in the middle of December, but the record does not disclose whether the day was cold. Neither does it disclose the character of the construction of the house for warmth, nor that the room was actually warm. There is nothing to suggest that a degree of heat was present in the room which would produce a seizure in Brewer.

Other than the testimony of Griffin concerning the action and appearance of the defendant the night before the crime, and the testimony of the former wife in relation to his appearance at 4 o'clock in the morning of the day of the crime, there is nothing to suggest that at the time the crime was committed the defendant was not mentally himself. The fact that Brewer did not look normal as he fled from the house in which the crime had just been committed would scarcely possess much probative value.

Brewer's seizures were violent. He was violent and destructive when under their influence. Neither the defendant nor any of his associates testified to any act done by Brewer during the day of the crime that would indicate that Brewer was under the influence of a mental disturbance of any kind. Prior to the moment when the crime was committed, he seems to have been quite composed; he had been sleeping on the bed in the room for an hour or more. The defendant did not claim that he was at all perturbed. His evidence in relation to the matter is as follows:

"It was getting late and we wanted to get through so I got going too fast and got overhet, and that evening after I got home from work, why, I lost my head, or something and I don't know whether it was the Missus called the law or not, but they called the law and they came out and picked me up. They didn't pick me up because of any crime, but on account of being out of my head. They brought me back home some time the next day, I think. Dr. Zinn, of Fort Dodge, took care of me. I wasn't as bad. after that as I was that night, but every time I would get hot, it seemed like I couldn't remember or couldn't think like I could before. This must have been about '23, I guess, or '24, eight or nine years ago. I have noticed the effect upon my health. When I am in a heated room, it seems to kind of smother me, and I get a headache quite often unless I get lots of fresh air. I have been out of my head after that time. This trouble comes on often, when I am worried, or something like that, it will press on me worse than if I wasn't worried. During the afternoon

of Friday, the 16th, I was sleeping in this room where the heater was, I had just put some wood in this heater, and the edge of the bed was about three feet from the heater, or something like that. I don't know how long I was laying there—it must have been close to an hour, or something like that. When I got up, I didn't realize what was going on; I jumped right up, I wasn't hardly fully awake when the shooting occurred. I didn't intend to pull that trigger, and I didn't aim the gun intentionally to shoot nobody."

The above testimony is from the direct examination of the defendant. He testified further on direct examination as follows: "I pulled this overcoat up over me and I went to sleep. I don't know what time I woke up. Pat (Griffin) woke me, he said, 'Get up.' I asked him what for, I said 'Let me alone' I wanted to sleep; I was tired, and he said 'Get up, there's a car coming.' So I got up and we went in the back room."

The defendant testified further on direct examination as follows:

"On Friday the 16th when Pat Griffin awakened me, this gun was in the pocket of the overcoat laying over me. When I got up, it fell out of my pocket and I shoved it back in the pocket of my overcoat. I took the overcoat into the other room with me, and to my knowledge throwed it down across a bed. I heard the officers come in and I heard them talking. They asked something about Frank Graves and then they asked for me, Brewer, and that is about all I heard them say. At the time I went into the room I did not have any intention of resisting a peace officer, nor had my partner and I had any talk together suggesting any such thing. When we came out, I couldn't say who opened the door, the first thing I knew the door was down and we came out. My intentions was in not shooting nobody. I was quite frightened and I didn't know what was going on and my intentions was to get away. I had no intention whatever to shoot nobody. I drew the gun for I thought that would keep them from drawing on us and taking us. I intended escaping out of the door after drawing on them. Mr. Griffin and I had no conversation whatever regarding that. To my knowledge he went out in front of me, and I went out behind him. He done all the talking; I never said a word. I figured Pat shot first, when he shot the last shot, I think I shot just about the time that he shot his last. I shot one shot. All three of these shots were pretty close together, I should think. This whole thing didn't take very long, I

judge fifteen seconds, or something like that. I had got over nearly to the stove before I shot, because I stubbed my toe against something like that. I didn't intend to shoot, I didn't aim, I just pulled my gun up like that. I suppose that I did have my gun pointed at one or the other of the men, I don't know for sure; it was the excitement. I didn't shoot intentionally. I shot one time, and didn't attempt to shoot another time. I got outside about three rods and I dropped my gun and when it dropped there was a piece on the side that came loose and dropped in the snow. When I ran out of the door, I did not know where I was going. I ran past somewheres near these two cars were standing, but didn't try to get into them or start them. We first headed out kind of straight south and then angled off towards town. When I ran out of this place I had on a pair of pants and my cap and shirt and a little knitted sweater-like-of-a-thing buttoned up in front. I didn't take my overcoat." •

At the close of the evidence the state moved to strike the evidence bearing upon the question of temporary insanity, and such motion was sustained by the court. Appellant complains only on the theory that the record was sufficient to carry the question of temporary insanity to the jury. We think there was no evidence in the record that the defendant was not mentally competent to commit the crime of murder, and in this situation and under the procedure followed in this case the action of the trial court in sustaining the motion to strike was proper. State v. Van Tassel, 103 Iowa 6, 72 N. W. 497.

In this connection it may be well to note appellant's objections to an instruction given by the trial court in relation to striking such evidence. The objections involve the same considerations involved in the motion to strike the evidence, and the discussion of the propriety of striking the testimony is decisive of the objections to the instructions. We will not pass by this question, however, without noticing the cases relied on by appellant. That the matter of the defendant's mental competency to commit a crime is a fact question and one for the jury is not open to doubt. State v. Geier, 111 Iowa 706, 83 N. W. 718. But, like other questions of fact, a finding of lack of mental competency must be based on some evidence. Such finding cannot be made in the complete absence of competent evidence. Appellant relies on Larson v. State, 92 Neb. 24, 137 N. W. 894. In that case the defendant's brother had been guilty of criminal relations with the defendant's wife. When the defendant told the

·brother of his knowledge of such relations, the brother sneered of the matter and treated it lightly; whereupon the defendant shot his brother with a shotgun. In that case there was evidence that the defendant was in poor health and that the matter was a source of great worry. In this situation the question of sanity was undoubtedly properly submitted to the jury because the evidence disclosed that at the time of the crime the defendant was subject to forces capable of producing mental aberration in him. The case of Oborn v. State, 143 Wis. 249, 126 N. W. 737, 31 L. R. A. (N. S.) 966, does 'not aid the appellant; in fact, the case sustains the views hereinbefore expressed. In that case the court says, reading from page 748 of the Northwestern Reporter:

"Thus, whether the accused was afflicted with epilepsy, and if so whether it was a mental disease, or whether it had progressed so far as to affect the mind, and if so whether the mind was so affected that the accused was not conscious of the wrongful character of his act at the time of the homicide, were all matters of fact to be established by the evidence."

The case of State v. Newman, 57 Kan. 705, 47 P. 881, cited by appellant, is similar in some respects to Larson v. State, above referred to. In that case the deceased had been intimate with the defendant's wife. The defendant came upon the deceased in his home, where it was admitted the deceased had gone for the purpose of having sexual intercourse with the defendant's wife. The killing followed almost immediately. In this situation it is obvious that at the time the deceased was killed the defendant was under the shock of the mental disturbance disclosed by the evidence. In State v. Robbins, 109 Iowa 650, 80 N. W. 1061, the defendant shot and killed his estranged wife. The evidence disclosed that the defendant had been the subject of epileptic seizures since the age of 3 years, at which age he sustained a very serious injury to his head. The evidence disclosed that the defendant entertained a very sincere affection for his wife and child, and that he was very greatly affected by the act of his wife in leaving him and taking their child with her. On the day of the killing the defendant borrowed a pistol from a friend, went to the house where his wife was working, and, after a brief interview, killed her. In this situation this court held that there was sufficient evidence to require that the special defense of insanity be submitted to the jury. It is of course evident that

in this case there was evidence from which it could be found that at the time the crime was committed the defendant was acting under the influence of his peculiar mental condition. The case clearly recognizes that the question of the mental competency of the defendant need not be submitted to the jury unless some degree of connection is shown between the act and the mental seizures under which a defendant may labor at times. The question need not be submitted to the jury unless there is some evidence tending to establish that at the time of the crime the defendant was in some degree affected by the unusual condition. Appellant contends that such cases show a tendency on the part of courts to submit the question of the sanity of the defendant to the jury. As before suggested mental capacity to commit a crime is a question of fact, and, like other fact questions, it can only be submitted upon evidence.

Counsel for appellant call attention to the fact that proof of intoxication is admissible in behalf of the defendant in prosecutions for crimes in which intent is an essential element. In such prosecution it is undoubtedly proper to permit proof of intoxication *at the time the act was committed,* but proof of intoxication on other occasions would not be admissible, for ordinarily intoxication at another time would have no effect upon the ability of the defendant to entertain the required intent at the time of the commission of the crime. We think it is obvious that proof of a mental condition which was neither progressive nor continuous was neither relevant nor material, in the absence of evidence indicating that the defendant was in some degree subject to its influence at the time the crime was committed. State v. George, 62 Iowa 682, 18 N. W. 298; State v. Hockett, 70 Iowa 442, 30 N. W. 742; State v. Cooper, 195 Iowa 258, 191 N. W. 891. It is not claimed that the defendant's mental seizures were either progressive or continuous. The record is absolutely barren of any fact or circumstance from which it can be inferred that at the time of the crime the defendant was under the influence of his mental ailment. The evidence of the defendant establishes clearly that he was quite calm and collected at the time of the fatal occurrence. He picked up his overcoat and took it with him into the side room. He picked up his pistol when it fell on the floor and put it in his overcoat pocket. He evidently took the pistol out of the overcoat preparatory to pouncing out on the officers. When under the influence of his mental disorder he was violent and excited. All of his witnesses agree upon this. If the defendant was tempo-

rarily insane at the time of the shooting, it was with a new mental malady, concerning which there was no evidence in the record.

In addition to the foregoing matter, appellant contends for such evidence that it was admissible generally on the questions of premeditation and intent to kill, even though not sufficient to establish insanity. This is an effort to draw a distinction that does not exist. The evidence was properly stricken because there was no fact tending to establish that the defendant was under the influence of the peculiar forces at the time the crime was committed. In this situation, how could such matters bear upon the question whether the defendant could deliberate or premeditate upon the crime or entertain an intent to kill or harbor malice?

██ II. The court instructed the jury that, in order to convict the defendant of murder in the first degree, the state must prove beyond a reasonable doubt that the defendant unlawfully shot Dilworth with a pistol on or about December 16, 1932, in Black Hawk county, Iowa, thereby inflicting injury that directly and naturally caused the death of said Dilworth, and that the shot was fired willfully, deliberately, premeditatedly, with malice aforethought, and with specific intent to kill Dilworth. The court defined the terms willful, deliberation, premeditation, malice, and malice aforethought. The court gave the following instruction in relation to intent to kill:

"You have been told that a necessary element of murder in the first degree is a specific intent to kill, and the intent existing in a man's mind is seldom, if ever, capable of direct proof. In determining the intent of the defendant, you have a right to infer or presume he intended to do that which he voluntarily did, and that he intended the probable and natural results to follow his acts deliberately and intentionally done, and which ordinarily follow such acts. The existence or non-existence of an intent must frequently be ascertained by the jury by such just and reasonable deductions and references from all facts and circumstances disclosed by the evidence as the guarded judgment of a candid and cautious man would ordinarily draw therefrom.

"If a person makes a wrongful assault upon another with a deadly weapon such as a pistol, and death ensues from the shot fired therefrom, *the inference is warranted that he intended to commit murder* in the absence of evidence that he intended a lesser injury. Such inference of presumption is not conclusive, but it is to be considered by you with all of the evidence in the case, or lack of evi-

dence, and it is for you to determine from all such evidence, or the lack thereof, whether or not the killing charged, if done by the accused, was done with a specific intent to kill said William F. Dilworth."

The appellant complains of the part of the instruction set forth in italics above. The complaint is that the instruction is misleading and that the jury might construe the instruction to mean that the guilt of the defendant of the crime of murder in the first degree could be inferred from the use of the pistol in a deadly manner. Appellant does not contend that the use of a deadly weapon in a deadly manner does not warrant an inference of malice and of an intent to kill. He does contend, however, that the inference must be of murder in the second degree rather than murder in the first degree. The appellant relies upon the following decisions of this court: State v. Phillips, 118 Iowa 660, 92 N. W. 876; State v. Krampe, 161 Iowa 48, 140 N. W. 898; State v. Leib, 198 Iowa 1315, 201 N. W. 29; State v. Woodmansee, 212 Iowa 596, 233 N. W. 725. It is apparent, however, from an examination of the instruction, concerning which complaint is made, and the cases referred to, that appellant is under a misapprehension of the scope and effect of the instruction and the holdings of this court in the cases referred to. Malice aforethought, deliberation, premeditation, and intent to kill are all essential elements of the crime of murder in the first degree. Malice and an intent to kill may be inferred from the use of a deadly weapon in a deadly manner, but deliberation and premeditation may not be inferred therefrom. Murder is the unlawful killing of a human being with malice aforethought. An intent to commit murder is an intent to kill with malice. The part of the instruction of which appellant complains is a correct statement of the law for, in that the law warrants the inference of malice and of an intent to kill from the use of a deadly weapon in a deadly manner, it must of necessity warrant the inference of an intent to commit murder, for such intent is but an intent to kill with malice. When associated with intent, malice must, in the nature of things, be aforethought.

In State v. Phillips, supra, the court instructed the jury that proof that the defendant used a deadly weapon in a manner resulting in death would in itself be prima facie evidence that the killing was willful, deliberate, and premeditated. The instruction permits the inference of deliberation, premeditation, from the use of the

deadly weapon in a manner resulting in death. The instruction condemned in that case goes beyond the instruction under consideration in that it permits the inference of such elements from such use of a deadly weapon. The case of State v. Krampe, supra, is not in point. It is authority for the proposition that deliberation and premeditation cannot be inferred from the use of a deadly weapon in a deadly manner. Neither is the case of State v. Leib, supra, in point, for it holds no more than that murder in the first degree may not be submitted to the jury in the absence of evidence to sustain a finding of premeditation and deliberation. The case of State v. Woodmansee, supra, is of no aid to appellant. It holds that the use of a deadly weapon in a deadly manner warrants an inference of malice but not of willfulness or premeditation.

The instruction under consideration relates only to the intent to kill. The necessity for a finding of deliberation and premeditation before returning a verdict of guilty of murder in the first degree was plainly stated by the court in other instructions. Unless we are to assume that the jury was confused by a plain statement of the law, there can be no merit in appellant's objections to the instruction.

III. Upon the trial of the case, testimony tending to impeach the testimony of a witness for the defendant was introduced. No request was made by the defendant for an instruction limiting the jury in the consideration of such testimony to impeachment purposes. The court did not give such instruction on its own motion. Appellant complains of this and contends that it was the duty of the trial court to give an instruction limiting such testimony to impeachment purposes. We have carefully examined the testimony for the purpose of ascertaining whether the character of the impeaching testimony was such that prejudice was likely to result to the defendant if the jury were not limited by the court to considering the testimony for its proper purpose. The testimony is of such a character that without instructions upon the subject of impeachment the evidence would of necessity be limited to consideration for impeachment purposes. It could in the nature of things have no other purpose or application than to test the credibility of the witnesses in relation to whose testimony the evidence was given. This was, of course, the proper scope of the evidence. The character of the impeaching evidence and the facts and circumstances under which it was given limited its application as effectively as the court could

have done by proper instructions. In this situation prejudice did not result to the defendant from the failure of the court to instruct upon the use and purpose of such impeaching evidence. We have held that, in the absence of a request for an instruction, a failure on the part of the trial court to instruct in relation to impeaching evidence is not reversible error. State v. Wrenn, 194 Iowa 552, 188 N. W. 697; State v. Wollert, 199 Iowa 1228, 201 N. W. 49.

IV. The appellant insists that upon the record as a whole it is evident that he did not have a fair and impartial trial. We have examined the entire record with care, as we are required to do by law, for the purpose of ascertaining whether appellant has had the trial which our law contemplates one accused of crime shall have. The trial resulted in a verdict of guilty, and the jury recommended that the death penalty be imposed. These facts do not indicate in and of themselves that a fair trial has not been had. They have, however, induced us to make a particularly careful examination of the entire record. Our conclusion is that the defendant has had a fair trial. We shall, however, notice a few of the matters of which appellant particularly complains.

The crime was committed on the 16th day of December, 1932. The trial of the defendant began on the 27th day of December, 1932. Appellant complains of the speed with which the state proceeded, but points out no circumstance which tends to indicate that the defendant did not have ample time for the preparation of his defense or that he suffered in any manner on account of the prompt disposition of the litigation. It is said that public feeling against the defendant was high at the time he went to trial. There is no suggestion in the record, however, and no complaint on the part of appellant, that the members of the jury which tried him were not properly qualified to serve in the trial of the case. It is said that the precautions taken by the officers to prevent the escape of the defendant were harsh and were calculated to prejudice the defendant before the jury. The defendant was handcuffed to an officer during the trial and while testifying in the case. It is said that, if the officers had made sure that the defendant was unarmed and had placed guards at all exits to the courtroom, the defendant might safely have been permitted to be in the courtroom unhampered by handcuffs. This may all be true, and yet this court cannot presume that the defendant was prejudiced because he was handcuffed. The

inference of prejudice which appellant asks this court to draw is not sustained by any circumstance in the record.

The appellant complains that the trial court unduly limited him in the cross-examination of one of the witnesses who was an eyewitness to the actual shooting, and especially complains of the failure of the court to require this witness to answer a question asked of him on cross-examination. Appellant does not complain that the action of the trial court was erroneous in and of itself, but cites the instance as one tending to establish that upon the whole record appellant has not had a fair trial. The incident, of which complaint is made, is one such as frequently occurs in closely contested lawsuits. We think the court in ruling upon the matter accurately and adequately described the situation as follows:

"Well, I think this question has been fully answered. I think the question is not quite fair to the record as made by the witness, and this question will not be required by the court to be answered further."

The appellant also contends in this connection that the action of the trial court in striking the testimony referred to in division I of this opinion prevented him from having a fair trial. We have given full consideration to the merits of this complaint. We conclude upon a careful examination of appellant's contentions and the entire record that he has had a fair trial.

V. Upon the conclusion of all the evidence, appellant made a motion asking the court to withdraw from the consideration of the jury the charge of murder in the first degree, on the ground that there was no evidence from which a finding of premeditation and deliberation could be made. We think there was ample evidence in the record to warrant the submission of the question of the guilt of the defendant of the crime of murder in the first degree to the jury. It appears without dispute in the evidence that at the time the officers approached the little house in which the crime was committed the defendant was asleep on a cot in the living room; that, when the officers approached the house, the defendant got up, and as he got up his pistol fell to the floor; that he retrieved it and put it in his overcoat before going into the side room; that, when the officers entered the room and made mention of searching the room in which appellant and his codefendant were hiding, the defendant and his associate jerked aside the sheet of wallboard that

served as a door and came into the room in which the officers were, with weapons in their hands, and immediately began shooting at the officers. The defendant must have taken his pistol from his overcoat preparatory to springing from the side room upon the officers. In this situation there was abundant evidence from which the jury might find that the fatal injuries were inflicted upon Dilworth, after deliberation and premeditation, and with intent to kill. In fact, such was the inevitable conclusion.

We find no error in the record. The judgment of the trial court is affirmed. It is ordered that a copy of the judgment herein signed by the clerk of this court and under the seal of this court be delivered by the clerk of this court to the Governor and to the sheriff of Black Hawk county, Iowa.—Affirmed.

All Justices concur.