STATE OF IOWA, Appellee, v. FRANCIS WRENN, Appellant.

**CONSTITUTIONAL LAW:** Equal Protection — Discrimination Between Criminal Offenders. *All* persons carnally knowing and abusing female children under the age of 16 years are punishable under Ch. 192, Acts 39 G. A. (substitute for Sec. 4756, Code, 1897), whether such offenders be under or over 25 years of age. To this extent, at least, the statute is constitutional. Whether said statute is guilty of the vice of making unconstitutional discriminations between offenders under other circumstances, *quaere.*

**CRIMINAL LAW:** Trial—Instructions in re Alibi. Principle reaffirmed that the court may instruct that the defense of alibi is one easily manufactured.

**CRIMINAL LAW:** Trial—Burden in re Alibi. Instructions reviewed, and held to require the accused to establish his defense of alibi by a preponderance of the evidence only.

**CRIMINAL LAW:** Trial—Instructions—Interest of Defendant. The jury may be told that they may consider the interest of one on trial in the outcome of the prosecution, in determining the weight and credibility of his testimony.

**CRIMINAL LAW:** Trial—Province of Court and Jury—Contradictory Statements. It is the province of the jury to pass upon the credibility of the prosecutrix in a charge of rape, notwithstanding the fact that she may, on different occasions, have made contradictory statements as to the transaction.

*Appeal from Plymouth District Court.*—C. C. BRADLEY, Judge.

JUNE 21, 1922.

REHEARING DENIED SEPTEMBER 30, 1922.

THE defendant was charged with, tried, and sentenced for the crime of rape. The indictment charges, in substance, that defendant, about September 12, 1921, did willfully, knowingly, and feloniously, carnally know and abuse Ethel Bray, a female child then and there under the age of 16 years, and a female person then and there under the age of 17 years, the said defendant being then and there a male person of the age of more than 25 years, and being over the age of 25 years. The defendant appeals.—*Affirmed.*

*T. M. Zink,* for appellant.

*Ben J. Gibson,* Attorney General, for appellee.

PRESTON, J.—The errors and points relied upon by appellant relate to the sufficiency of the evidence and alleged errors in instructions; also to the constitutionality of Chapter 192, Acts of the Thirty-ninth General Assembly. It is thought by appellant that the act violates Section 6 of Article 1, Section 9 of Article 1, and Section 30 of Article 3, of the Constitution of Iowa, and the Fourteenth Amendment to the Constitution of the United States. The questions were raised by demurrer to the indictment, by motion to direct a verdict of not guilty, by exceptions to the instructions given, by motion in arrest of judgment, and in the motion for new trial. This is the point most relied upon for reversal. Chapter 192, above referred to, provides:

"Section 1. [a] If any person ravish and carnally know any female of the age of sixteen (16) years or over, by force or against her will, or [b] if any person under the age of twenty-five (25) years carnally know and abuse any female child under the age of sixteen (16) years, or [c] if any person over the age of twenty-five (25) years carnally know and abuse any female under the age of seventeen (17) years, he shall be imprisoned in the penitentiary for life or any term of years."

Section 2 is a saving clause, to the effect that nothing in the act shall bar any prosecution for any crime committed in violation of Section 4756 of the Code, prior to the taking effect

of this act.  Section 3 repeals Section 4756 of the Code.  For convenience, we have made a sort of subdivision of the provisions of Section 1.

The transaction in question is alleged to have taken place in September, 1921, after Chapter 192 took effect.  The first subdivision defines rape in substantially the same language as does the first part of the repealed Section 4756, except that the age of consent is fixed at 16 years, instead of 15.  The prosecutrix, Ethel Bray, was under 16 years of age at the time of the alleged intercourse.  It is not claimed that the intercourse was by force or against her will.  As we understand it, defendant was about 30 years of age; but whether he is under or over 25 is not, in this case, very material.  The second subdivision, as we have quoted Chapter 192, has reference to a case where one who is under 25 years of age has carnal knowledge of a female child under the age of 16 years.  Paragraph 3 has reference to a case where a person over 25 has carnal knowledge of a child under 17.

1.  Appellant contends that Chapter 192, before referred to, is, as a whole, unconstitutional.  The grounds of the objection, as stated in the demurrer, motion for verdict, and so on, may be stated in a somewhat condensed form as follows:  That said chapter is contrary to the provisions of the Iowa Constitution before mentioned, in that said chapter is class legislation, arbitrary, unnatural, not uniform in its terms and application, and denies the defendant equal rights, privileges, and immunities under the Iowa Constitution, denies defendant his rights and liberty without due process of law, and abridges his rights and liberty and immunity, and does not extend to him equal protection in his rights; that it violates the Fourteenth Amendment to the Constitution of the United States for the same reasons; and that it is discriminatory in its terms, provisions, and application, against the defendant.  The grounds are amplified somewhat in the motion for verdict, wherein it is claimed, and it is argued, that the statute does not apply to all the citizens of the state of Iowa under like circumstances, makes the act of carnally knowing a female therein mentioned a crime for a man over 25 years, and not a crime for a man under 25 years to

1. CONSTITUTIONAL
LAW: equal pro-
tection: discrim-
ination between
criminal offend-
ers.

carnally know a female under the age of 16 years, and does not make the same act a crime for a man over 25 years of age to carnally know a female under 16 years; that it makes it a crime for a man over 25 years of age to carnally know a female over 16 years of age and under 17, and does not make the same act a crime for a man under 25 to carnally know a female over 16 and under 17 years of age. A large number of cases decided by the courts of other states and of this state, also of the Supreme Court of the United States, are cited on the several propositions argued, and appellant states that the decisions of the courts of the other states are in harmony with the Iowa decisions. We shall not cite all the cases. The Iowa cases cited are *State v. Garbroski,* 111 Iowa 496; *Dunahoo v. Huber,* 185 Iowa 753, 756; *Lee v. Hoffman,* 182 Iowa 1216, 1221, 1228; *State v. Collins,* 178 Iowa 73, 79, 89; *Hubbell v. Higgins,* 148 Iowa 36, 39, 40; *Huston v. City of Des Moines,* 176 Iowa 455, 468; *City of Des Moines v. Bolton,* 128 Iowa 108; *State v. Santee,* 111 Iowa 1; *Cedar Rapids Water Co. v. City of Cedar Rapids,* 118 Iowa 234; *State v. Fairmont Creamery Co.,* 153 Iowa 702, 704; *Hunter v. Colfax Consol. Coal Co.,* 175 Iowa 245, 266, 322; *Coggeshall v. City of Des Moines,* 138 Iowa 730, 736; *State v. Sargent,* 145 Iowa 298. Cases by the Supreme Court of the United States, discussing the Fourteenth Amendment, which are cited are: *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150; *Yick Wo v. Hopkins,* 118 U. S. 356; *Barbier v. Connolly,* 113 U. S. 27; *Soon Hing v. Crowley,* 113 U. S. 703; *Connolly v. Union Sewer Pipe Co.,* 184 U. S. 540; *In re Converse,* 137 U. S. 624; *Leeper v. Texas,* 139 U. S. 462; *McFarland v. American Sugar Ref. Co.,* 241 U. S. 79. On the other hand, it is contended by the State that the statute in question is constitutional in all its parts. The argument, briefly stated, is that it is the duty of each of the three branches of government to observe and not to offend against the Constitution of the state. It is argued that this court must assume that the legislature did that which it ought to have done,— namely, to consider the question as to whether or not the classification complained of offended against the Constitution,— and that the legislature had a distinct reason for such classification; that the courts have nothing to do with the wisdom and advisability of legislation, such matters being vested in the legis-

lature, which is paramount. The argument is that it is only where a law is clearly, plainly, and palpably unconstitutional, that the courts will interfere (*Rowley v. Clarke*, 162 Iowa 732). The State also argues that the courts have uniformly upheld the classification statutes, save where the classification is purely arbitrary and unreasonable. It is suggested that the legislatures of the different states have fixed the age of consent of the female at different ages, and that all such statutes have been upheld because no definite and fixed rule can be made; that the discretion in that regard is for the legislature, where it will be left by the courts. We may say, in passing, that we do not understand counsel for appellant to question the right of the state to fix an age of consent for the female, and to provide that, if a male shall carnally know a female under such age, then he shall be guilty of rape. Such statutes have almost uniformly been upheld by the courts of the land. It is further contended by the State that the same rule applies as to the proper age or classification of males in cases of this character; that the fixing of such age is a legislative act; and that, if there is any reason to sustain it, the courts will do so. It is argued that the courts may not say that the age of 25 is arbitrary and unreasonable, because it is a matter of common knowledge that men do not reach the age of maturity in all respects at any definite age; that, as a matter of common knowledge, the age in which minds of men become fixed, so far as criminal tendencies are concerned, is somewhere between the ages of 20 and 30; but that it is impossible to fix an exact date; that the fixing of such age is a legislative act, and not a judicial one. It is argued that the moral sentiment of the people with regard to sex crimes has been progressing; and further, that the acts of men of mature age in sex matters are condemned, but that the acts of youth in this regard are not so severely condemned.

The argument is that all these matters could have been and must have been considered by the legislature in enacting the statute complained of. As to whether a classification in a given case is arbitrary and unreasonable, and the discussion in regard thereto, the State cites *State v. Fairmont Creamery Co.*, 153 Iowa 702, 706, and cases therein cited. The State also cites, to sustain its position on these matters, *Central Lbr. Co. v. State*

of *South Dakota*, 226 U. S. 157, 161, and cases. In the view we take of the case, it is unnecessary, at this time, to pass upon all the questions argued by appellant. We do not consider constitutional questions unless it is necessary for the determination of the case. *Bond v. Wabash, St. L. & P. R. Co.*, 67 Iowa 712; *State v. Rosencrans*, 65 Iowa 382. Other cases might be cited, but the rule is well settled. It is also a rule of the court that we do not declare a statute unconstitutional *in toto*, even though it be unconstitutional in part, if sufficient remains to effect its objects without the aid of the invalid portion; and in such case, only the latter is rejected, and the former stands. *Santo v. State*, 2 Iowa 165, 205; *City of Keokuk v. Keokuk N. L. Packet Co.*, 45 Iowa 196, 211; Idem, 95 U. S. 80. Our attention is called to similar statutes in 17 or 18 states, wherein ages of both male and female are fixed, and wherein the ages of both are different from our own, and different in the several states. Some of the statutes fix the age of the male at under a certain age; others over. We are cited to no cases wherein any of such statutes have been held unconstitutional.

We deem it unnecessary, in this case, to determine whether the statute in question is constitutional in all its parts, or to discuss all the propositions argued by appellant in regard to classification, in so far as the same applies to the facts of this case. The indictment charges defendant with having had carnal knowledge of a female child under the age of 16 years. The evidence shows that Ethel Bray was under the age of 16, and necessarily she was under 17. The second division of the statute in question provides that, if any person under the age of 25 years carnally know and abuse any female under the age of 16 years, or if any person over the age of 25 years carnally know and abuse any female child under the age of 17 years, he shall be punished, etc. Under this provision, and under the indictment and the evidence, it would seem that the age of the male is immaterial, for the reason that all males under the age of 25 years would be held, and all males over the age of 25 years would be held. This being so, in so far as the females under the age of 16 are concerned, the statute simply provides that such age shall be the age of consent, and in such case the statute is uniform in its application to all. Under the record in this

case, the statute complained of can be upheld. It follows, therefore, that the rulings of the district court upon these matters were correct.

. 2. Prosecutrix testifies that she retired at about 8 o'clock in the evening of September 12th, in the girls' dormitory, went to sleep, and was awakened during the night by Father Wrenn, the defendant, who was shaking her. The defendant contends that he was not there at the time alleged. Evidence on his behalf tends to show that he retired about 11 o'clock that night, and did not leave the house until the next morning, about half past 7. The priest's house, where defendant lived, is on the west of the half block; the church is a few feet east of that; and the school building is several feet east of the church. The parish grounds cover one-half block. The dormitory was on the third floor of the school building. We do not understand counsel for appellant to claim that it was not a jury question in regard to the defense of alibi. The court, in Instruction 17, instructed with reference to alibi. The complaint is in regard to the language of the instruction. The jury was told that an alibi, if proven, constitutes a complete defense, and entitles defendant to an acquittal; that the defense is as proper and legitimate as any other. A part of the instruction complained of by appellant is the language:

*2. CRIMINAL LAW: trial: instructions in re alibi.*

"Nevertheless, it is proper to say that this defense is recognized in law as one easily manufactured, and it will be your duty to examine the evidence with care and caution on this, as on every other branch of the case, and to give such weight and credibility to it as it would seem to you entitled to receive."

No cases are cited by appellant as to the alleged impropriety of such an instruction. It has been approved in many cases. *State v. Rowland,* 72 Iowa 327; *State v. Blunt,* 59 Iowa 468; *State v. Watson,* 102 Iowa 651; *State v. Worthen,* 124 Iowa 408; *State v. Concord,* 172 Iowa 467; *State v. Minella,* 177 Iowa 283; *State v. Carey,* 188 Iowa 1308.

Another objection to the instruction is that it is claimed that it puts the burden upon the defendant of proving the defense beyond a reasonable doubt. It is argued that defendant

was required to prove his alibi by a preponderance of the evidence only, and that the court should have said so. Appellant cites *State v. Brandenberger*, 151 Iowa 197, 209. We think the court did so say. Another part of the instruction reads:

*3. CRIMINAL LAW: trial: burden* in *re alibi.*

"The burden of establishing an alibi is, by our law, upon the defendant, who relies upon it, and the evidence introduced to sustain it should outweigh the evidence introduced by the State, tending to show that the defendant participated in the crime. But the defendant is not bound to establish such defense beyond a reasonable doubt. If, upon the whole case, the testimony before you raises in your minds a reasonable doubt that the defendant was present at the time and place in question, then it will be your duty to give him the benefit of that doubt, and acquit him."

There was no error at this point.

3. In Instruction 20, the court gave the rule for weighing the testimony of defendant, who had testified as a witness. Complaint is made of this, but no cases are cited. The instruction has been approved in a number of cases. *State v. Young*, 104 Iowa 730; *State v. Moelchen*, 53 Iowa 310; *State v. Sterrett*, 71 Iowa 386; *State v. Walker*, 133 Iowa 489, 497; *State v. Stuart*, 190 Iowa 476; *State v. Steidley*, 135 Iowa 512.

*4. CRIMINAL LAW: trial: instructions: interest of defendant.*

4. Appellant contends that, because of the contradictory statements and impeachment of the prosecuting witness, and other circumstances in the case, her story should not be believed, and that it is improbable that the transaction took place, as claimed by the State. We shall see later that she is corroborated by other evidence as to the transaction itself, and by witnesses who were present in the same room. Before going to the circumstances tending to impeach prosecutrix, we shall refer, as briefly as may be, to some other pertinent circumstances. It would be indelicate to state in the opinion the details of the acts testified to, and we shall endeavor to state the facts, without giving the exact language used by the witnesses. Prosecutrix testifies that her people are Catholics, and that she attended this school. Some of the undisputed facts are that defendant is a Catholic priest,

*5. CRIMINAL LAW: trial: province of court and jury: contradictory statements.*

and had the parishes of Akron and Westfield, Iowa. A parochial school is maintained at Akron. As pastor of the Akron parish, defendant was general superintendent of the parochial school. Ethel Bray and five other girls attended the school. The six girls slept in one of the dormitories. On the night of September 12th, the girls retired about 8 o'clock, and one sister, a teacher, slept in a separate room, adjoining the girls' dormitory. There is a conflict at other points. Prosecutrix testifies that, a few months before September, defendant called her to the church entrance, hugged her, kissed her, raised her dress, and took improper liberties with her, and told her not to tell; that he told her he loved her, and would give the world for her. She testifies to similar acts on two other occasions thereafter, and before September 12th, when defendant called her into the sacristy in the church. She testifies further that thereafter she went to the parsonage or home of defendant, to clean house, and stayed two or three days in July, alone with defendant; and that, while she was so in the home with defendant alone, similar transactions occurred; and that, at another time, at the home of her parents, there were similar transactions, when her mother was not present. She says that, when she went to defendant's home to clean house, she thought he might take liberties with her, but that it never occurred to her that he might insist on having sexual intercourse with her. She describes in detail the familiarities and liberties which she claims defendant took with her person. Defendant testifies that he asked the girl's mother if she could go to Akron, and that she went with him, and that there was no one in the house during that time, unless it was some caller. One of the other girls testifies that she saw defendant call Ethel off to one side, and that he was always whispering to her, and talking to her about her hair and her dresses. Prosecutrix says that defendant was not more attentive to her than to the other girls. Prosecutrix testifies that defendant gave her a wrist watch and a picture; that this was after she stayed at defendant's house: and she says she did not think he gave them to her from any improper motive. Defendant denies all familiarities, and denies that he ever had intercourse with her. She testifies that there was no act of intercourse prior to the night of September 12th. She testifies that there was

intercourse at that time. The impeaching circumstances, or some of them, are that, on the morning of September 13th, prosecutrix told Sisters Raymond and Angeline that defendant came into the dormitory; that he did not have sexual intercourse with her on the night of September 12th. On September 14th, with her father and mother, she went to Sioux City and saw the bishop and Father McCarthy, of Sioux City. Her father and mother were not in the room when she was sworn and examined before the parties last mentioned. The bishop and Father McCarthy were both present when she was examined. Her father and mother and the witness went to see the bishop, to see if they could not remove the defendant, and get him away from the Akron parish. The bishop superintends the priests of that diocese. She signed a written statement before them. The bishop asked the questions. She testifies that she was ashamed to tell the bishop the truth. She admits that she stated that defendant tried to enter her body, but that she did not let him. She testifies, on cross-examination, that, at the time last mentioned, the following questions were asked her, in regard to the transaction of the night of September 12th, and that she gave answers as follows:

"Q. Did he say anything then? A. Yes. He said, 'Won't you let me in?' and asked me why. Q. What did you say? A. I said, 'Because you hurt me, and because I am afraid you will ruin me.' Q. What then? A. After a little, he got up and buttoned up his trousers, coat, and vest. Just before getting up, he said, 'I will come back here about 11:30 and see you.' After he dressed, he stooped down and kissed me, and said 'Good night.'"

Prosecutrix admits that she gave such testimony, and at least one of the parties then present gave testimony on that subject. She also testifies that, at that time and place, she told the parties present that, prior to September 12th:

"I went to the church and into the sacristy, to get a prayer book and rosary blessed, and when I went in, he kissed me and put his arms around me; told me to lie down. He said he wanted to touch me, and I got down. Q. And did you know what it meant when the bishop swore you to tell the truth, the same as you do now? A. Yes, sir. Q. Aren't you mistaken

about him entering your body in the dormitory, the night of September 12, 1921? A. No, sir; he did.''

Nora Derocher, 14, testifying for the State, says of the transaction of September 12th that the girls went to bed about 8 o'clock; that all the girls were in the same room; that some of the girls were on small cots.

''Ethel Bray's bed and my bed were about four or five feet from each other. Rita McCarthy slept at the foot of Ethel's bed,—the head of her bed at the foot of Ethel's. We went to sleep about 8 o'clock, and I don't know just what woke me up during the night; but when I woke up, I saw a flash. A match was lit. I saw the flash of light, and I saw Father Wrenn looking right over Rita McCarthy's bed, and he was holding the match and looking at Rita's head,—just looking down, to see who was in that bed. There was a light in the hall; it made just a small light in the room. When I first saw Father Wrenn, I shut my eyes; then turned and opened them again, and was looking towards the hall; and when I saw him again, he had his coat off, and threw it on the floor, unbuttoned his collar and threw it on the floor; and then I turned over, and closed my eyes. He went over to Ethel's bed, after the match burned a little while. When I opened my eyes, after closing them, the party in the room stood right at Ethel's bed. I heard talking right at Ethel's bed. He said he loved Ethel with all his heart, and would give up the whole world for her, and something about her folks, and communion, and what he did there, and wanted her to come with him; and I heard Ethel say, 'Ouch, that hurts;' and he said, 'No, it don't.' He was in the room 15 or 20 minutes, and when he went out, he stumbled over a pail in the middle of the room, which we use if we have to get up in the night. I heard Sister Raymond get up, when this happened.''

This witness also says:

''Sister Raymond called me the next morning, and then she called Sister Angeline; and I told them I was sick, and knew who was in the dormitory. I couldn't eat any breakfast, and wanted to call mamma on the phone. Sister Angeline wanted to know what for, and I told her I was sick, and she wanted to know what was the matter with me. She said, 'Didn't you sleep last night?' and I said, 'No, sister;' and she made

me tell why I wanted to call up; and I told Sister Angeline who it was, right after we had breakfast."

Sister Raymond testifies of the transaction that night:

"We never had any trouble about anyone getting into the building,—no one ever bothered us; and sometimes we left the doors open,—not purposely; but I locked the door to the fire escape that night, but it was open the next morning, and I do not know how it was opened. * * * The other four girls in the room were younger than Ethel and Nora. An electric light was in the hall that night, but it did not reflect very much in the girls' dormitory, but I think I could distinguish a figure moving around. I was awakened by someone whispering in the girls' dormitory, and thought the children were talking; then a water pail was kicked over, and I got up, looked out of my door, and saw a man outside the dormitory. I could distinguish the color of the clothing, and that is as far as I looked. I was paralyzed with fright, as I didn't expect he would go into the children's dormitory, and I didn't know what was the matter or who the man would be, at first; I didn't know what to think. He went out, and I thought the children would be all right till morning, and I went and locked the door. He came out of the girls' dormitory in the hall, went into the boys' dormitory and down the fire escape; but I did not see his face, and am unable to identify him. I cannot say whether his figure was that of a boy or a man; but from the size of his feet, he was not a boy."

Ethel Bray testifies of the transaction the night of September 12th: that she retired about 8 o'clock; that Nora Derocher went to bed at the same time; that there was nothing between the two beds.

"We slept on single cots or small single beds. I went to sleep, and was awakened during the night by Father Wrenn, shaking me; but he said nothing to me, and I said nothing to him. He took off his coat and collar, and got into bed with me, and he loved me; said he would give up the world for me; put his arms around me, kissed me, showed affection for me. I saw him unbutton his trousers after he got into bed. He asked me if I would go away with him, if he had a sum of money."

She testifies to the intercourse and penetration. She says further that defendant was there about 15 or 20 minutes; that

she heard him leave; that he kicked a bucket over; that it sat by the McCarthy girl's bed. Prosecutrix made no outcry at the time, and it does not appear that there was any resistance on her part then or at the prior times that she claims there were liberties taken with her person. Defendant took her home Tuesday (the 13th), in his automobile. There is medical testimony as to an examination of the prosecutrix, and perhaps some other circumstances; but we shall not go further into the evidence.

From the foregoing, it will be seen that prosecutrix did make contradictory statements. These were properly admitted as impeaching. As said, she is corroborated by other witnesses who were present at the time of the transaction. She may have been, and doubtless was, more or less embarrassed and ashamed, when she appeared before the bishop and Father McCarthy. She may have had a feeling of fear or awe in appearing before the high officers of the church with a story of this character. The purpose of her going to Sioux City with her parents was to secure the removal of the defendant from the Akron parish. It may have been thought that the removal could be secured by relating other circumstances, showing familiarities and liberties, without her stating that the completed act was done. Naturally, the officers of the church before whom she appeared would not wish to have a priest under them doing the things charged against the defendant. On the other hand, they may have considered that, if such a charge as made by plaintiff was established, it might be injurious to the church organization. In either event, the matter could be, with propriety, investigated, and if defendant was doing the things charged against him, the matter could, with equal propriety, be presented to the bishop, in order to secure defendant's removal. Of course, this is not the question in this case. The question is in regard to her contradictory statements; and we have suggested some of the matters that occur to us which may have been considered by the jury in weighing her testimony and the testimony of some of the other witnesses. Though there were contradictions in the testimony of prosecutrix, and impeaching circumstances, her testimony was that given on the trial of the case before the jury; and her credibility and the weight to be given to her testimony, notwithstanding the impeachment, were for the jury. *State v.*

*Carpenter,* 124 Iowa 5, 11; *State v. Dietz,* 162 Iowa 332, 335; *Landis v. Interurban R. Co.,* 173 Iowa 466, 471; *State v. Alderman,* 187 Iowa 244, 248; *Hess v. Dicks,* 192 Iowa 378.

5.   Finally, it is contended that the court erred in failing to instruct the jury regarding the impeaching testimony offered relative to the evidence of prosecuting witness.   The court instructed the jury generally as to weighing the testimony of the different witnesses.   No instruction was asked by the defendant on this subject.   It would have been proper enough had the trial court given an instruction on the subject; but under the circumstances, the failure to do so is not reversible error.

We discover no reversible error in the record.   The judgment is—*Affirmed.*

STEVENS, C. J., WEAVER and DE GRAFF, JJ., concur.