STATE OF IOWA, Appellee, v. CARMELLA RUSSO, Appellant.

**CRIMINAL LAW:** Appeal and Error—Harmless Error. On a charge 1 of murder, with defense of insanity, it is not error to exclude a slanderous letter written by the deceased, of and concerning the

accused, when the accused had never seen the letter prior to the killing, and when the contents of the letter were not in issue.

**HOMICIDE:** Self-Defense—Refusal to Submit. Manifestly, the de-
2 fense of self-defense should not be submitted when the record is bare of any evidence sustaining the defense.

**HOMICIDE:** Justifiable or Excusable—Insulting Conduct. Principle
3 reaffirmed that a homicide may not be justified on the ground of insulting conduct by the deceased.

*Appeal from Appanoose District Court.*—FRANCIS M. HUNTER, Judge.

JUNE 21, 1922.

THE defendant was tried in the court below upon a charge of murder. She was convicted of manslaughter, and appeals.— *Affirmed.*

*Wilson & Smith,* for appellant.

*Ben J. Gibson,* Attorney General, and *John Fletcher,* Assistant Attorney General, for appellee.

STEVENS, C. J.—I. The indictment charged Carmella Russo, an Italian girl 16 years of age, with the crime of murder. She was convicted in the court below of manslaughter, and sentenced to an indeterminate term, not exceeding eight years, in the Women's Reformatory at Rockwell City. Although the killing is admitted, and the sufficiency of the evidence to sustain the conviction unchallenged, other questions discussed by counsel for appellant make necessary a somewhat detailed statement of the facts surrounding the tragedy.

The principal defense relied upon was the insanity of the defendant. The defendant resided with her parents in an 11-room house, on Eighteenth Street in the city of Centerville, a short distance south of a Rock Island railroad crossing. Antonio Matto, a fellow countryman, who was killed by the defendant, boarded for several weeks at the home of defendant's parents. A short time before the tragedy, which occurred June

15, 1920, he went to board at another place. On the evening in question, Matto left his boarding place, and walked south toward the city on the east side of Eighteenth Street, until he arrived in front of the Russo home. He was followed closely by John Jones, who testified that Matto turned in toward the front of the defendant's home, went to the front porch, where the defendant was standing, and took hold of her hand or arm, and said something to her in Italian, which the witness did not understand. The defendant went into the house, and immediately reappeared with two guns in her hands, and fired two shots at Matto. Matto ran east around the north side of the house to an alley, then south to O'Neil Street, and west on the south side thereof to Eighteenth Street, where he turned south and to the rear of a lot on the east side of Eighteenth Street. He was pursued by the defendant and her father, George Russo, who kept slightly in advance of the defendant.

It is not claimed that George Russo was a party to the shooting, and the evidence shows that he did not know what the trouble was, and was trying to prevent the tragedy. The defendant quickly overtook Matto, and fired eight shots into his body, three of which struck him in the abdomen, two in the neck, one in the chin, one in the shoulder, and one about the small of the back. He fell to the ground, and soon expired.

One of the guns with which the defendant was armed when she came out of the house was taken from her by her mother, before she started to go to the alley. The court permitted the defendant to show that, on numerous occasions during the time Matto boarded with her parents, he tried to induce her to have intercourse with him; that he took hold of her and tried to take her to a bedroom, offered her $5.00, and wanted her to run away with him; and that there was other insulting and immoral conduct toward her. Matto was married, but his family lived in Italy. The evidence shows that the defendant was very much annoyed by the solicitations of Matto, and that she resented his attentions to her. The defendant and Cosmo Millone, a Sicilian, were lovers, and expected some time to be married. Matto knew of their relation, and was apparently jealous of Cosmo. At any rate, he wrote a letter to Pete Crachiolo, defendant's brother-

in-law, who was in camp at Camp Dodge, intimating that the defendant had been intimate with her cousin; and he later wrote a letter to Cosmo, telling him that defendant had given birth to a child at Des Moines.

The defendant attended the public schools in Centerville until she was ready to enter the eighth grade, when she went to Des Moines, and took a course in shorthand and typewriting. At the time of the tragedy, she was employed by, and worked in the office of, a local abstract company. She knew about the letter written by Matto to her brother-in-law, but previous to June 15th, had never heard of the letter written by him, or at his dictation, to Cosmo. Cosmo was working at Rock Island, but visiting in Centerville. He walked with the defendant from her home to the abstract office, on the morning of the tragedy. Both the defendant and Cosmo testified that·he then told her about the letter he had received from Matto, and promised to send it to the defendant when he returned to Rock Island. He returned to Rock Island the same day. The defendant further testified that she had previously noticed that Cosmo was greatly changed in his attitude toward her. About 10 o'clock, she went to the office of the sheriff and requested a permit to carry a gun. The sheriff refused her a permit unless she brought him a recommendation from the mayor, or a justice of the peace. She promptly called upon the mayor, a justice of the peace, and the deputy sheriff, but was refused a recommendation or permit. She left the office of her employer in the afternoon, saying that her mother was ill, went to the office of the family physician, obtained some medicine for her mother, and then went home. The tragedy occurred that evening, shortly before sunset. Several witnesses testified that, while she was shooting Matto, she repeated that "he tried to take her honor from her." George Russo testified that, when he overtook Matto on the lot where he was killed, he told him that he would take him to court, and that Matto said, in substance:

"Don't kill me, George. You have a right to send me to the pen."

Immediately after the shooting, the defendant said to her father, "Come, father, I'll go to the law myself." When she

arrived at the house, she called the sheriff's office over the tele-
phone, and told the deputy that she had killed a man, and re-
quested him to come and get her. She also told two or three
other parties that she had shot or killed a man. When the of-
ficers arrived, she gave one of them the letter written by Matto
to her brother-in-law, with the request that he keep it, and asked
permission to ride on the front seat of the patrol wagon with
the driver, which she did on the way to the mayor's office. The
testimony tended to show that she was cool and but little ex-
cited when the officers arrived. We omit mention of many de-
tails which are not necessary to be considered in disposing of
the questions presented for review.

Many alleged errors of the court in ruling upon objections
to testimony are assigned by appellant. It would be a tedious
and unnecessary task to consider and discuss each assignment
separately and in detail. Many of the rulings of the court were
correct; while some were probably erroneous, but without
prejudice.

The sheriff testified in chief, on behalf of the State, that the
defendant came to his office about 10 o'clock in the morning,
and requested a permit to carry a gun; that he declined to grant
same, without a recommendation from a justice of the peace or
the mayor. He was asked, upon cross-examination, to state
whether, from her appearance, the defendant seemed to be seri-
ous or joking, and to describe her condition. An objection to
this question was sustained. The ruling was clearly correct.
The testimony of the sheriff was confined to the defendant's
request for a permit to carry a gun, and what was said on that
subject.

A witness was permitted to testify that Matto said, when
he started south on Eighteenth Street, just before he was killed,
that he was going to a show. This testimony was received over
the objection of defendant's counsel. Whether properly ad-
mitted or not, it was clearly without prejudice.

A witness testified that defendant occasionally wrote letters
for him, and that, on the evening in question, and shortly before
the shooting, he went to her home to have her write an affidavit
or letter in Italian for him. The witness told her what to write.

After the document was completed, she took it out on the porch for her father to read. The witness was asked to state whether any corrections had to be made in the letter or document. The court sustained the objection of the county attorney to this question. The witness was later permitted to testify, however, that the letter or document had to be entirely rewritten. This evidence was offered as bearing upon the mental condition of defendant at the time of the shooting. If the ruling was erroneous, it was so manifestly without prejudice as to require no further consideration.

Dr. Tillmont testified that he was the family physician of George Russo and family, and that defendant came to his office about the middle of the afternoon on June 15th and asked for medicine for her mother; that, while she was in the office, he noticed her looking out of the window; that, when she turned around, he saw that she was crying; that he asked her if her mother was "bad sick," and that she replied, "No, that isn't the trouble;" that she said she had lost considerable sleep, and that she was very nervous; that she was pale, trembling, and agitated. The witness said to her: "Carmella, you are in pretty bad condition. Why?" He was here interrupted by an objection by counsel for the State, which was sustained upon the ground that the witness should not be permitted to detail the conversation had with the defendant. This witness later testified fully as to the appearance and mental condition of the defendant, and in answer to a long hypothetical question, gave it as his opinion that she was insane at the time of the shooting. The record does not disclose what the conversation with the defendant was, nor is it claimed that anything bearing upon her mental condition was said by her.

George Russo was asked by the county attorney, on crossexamination, as to certain statements made by him to William Rhodes, to the effect that, if Carmella had not killed Matto, he would, and that he said, "When a man interferes with a man's family, it is time to do something." The testimony was received without objection. The father of the defendant denied having had such a conversation. Rhodes was later called by the State in rebuttal, and permitted to testify, over defendant's

objection, that a conversation to the effect indicated was had by
him with Russo. The objection should have been sustained.
The attempted impeachment was upon a collateral matter. The
State made no claim that George Russo was in any way impli-
cated in the tragedy, and the evidence showed that he tried to
prevent it. The evidence, however, was hardly less favorable
to the defendant than to the State. The defendant traced the
origin of her alleged insanity to the effect upon her mind of the
alleged immoral solicitations and attentions of Matto to her, and
his conduct in talking about her and in writing the letters men-
tioned. Naturally, the father, when informed thereof, resented
the conduct of deceased. So far as the record shows, however,
he knew nothing about it until after Matto's death. The killing,
as stated, was not denied, but was expressly admitted of record
by defendant's counsel.

The letter referred to in the evidence as Exhibit 2, which
was written at the request of Matto to Cosmo Millone, was of-
fered in evidence by the defendant, and excluded upon the
objection of the county attorney. The defend-

1. CRIMINAL LAW: appeal and error: harmless error. ant knew nothing about this letter until after
the tragedy, except what she had been told by
others, and we perceive no theory upon which it was admissible.
It was offered, as stated by counsel, for the purpose of cor-
roborating the testimony of Cosmo. His testimony was not de-
nied. The exclusion of the letter, whether erroneous or not,
was wholly without prejudice.

Many other rulings of the court are complained of. We
have examined each assignment with the care and scrutiny the
importance of the case requires. We find no reversible error
in the court's ruling upon objections to testimony. The sole
defense urged upon the trial was the claimed insanity of the
defendant. Great liberality in the introduction of testimony
upon this issue was allowed by the court. No detail or circum-
stance having the slightest bearing thereon was rejected, and
much testimony of doubtful competency was offered by the de-
fendant and admitted. We have neither overlooked nor failed
to give due consideration to the rulings of the court complained
of.

II. An instruction requesting the court to submit to the jury the defense of self-defense was refused. This ruling by the court is also complained of. As will appear from the foregoing statement of the facts, no testimony whatever was offered, tending in the slightest degree to make out that the killing was done in self-defense. Matto did not enter the house, or seek to prevent the defendant from doing so. Her mother, sister, and brother-in-law were present at the time, and her father and a neighbor were sitting on the porch at the northeast corner of the house. As stated, she went into the house, obtained two pistols, and returned to the porch, from which she fired one or two shots at Matto, and then pursued him, as he ran, for more than a thousand feet; and when she overtook him, she deliberately fired eight shots into his body, two of which were necessarily fatal. The deceased was unarmed, and made no threat or hostile demonstration of any kind toward the defendant. The court properly refused to submit this issue to the jury. *State v. Partipilo,* 139 Iowa 474; *State v. Sloan,* 149 Iowa 469.

2. HOMICIDE: self-defense: refusal to submit.

III. Twenty-one instructions were requested by the defendant. Error is assigned because of the refusal of the court to give a number of them, in addition to the one relating to self-defense. We have carefully examined each of the several requested instructions and compared the same with the court's charge to the jury, which was full and complete, and embodied all of the essential propositions covered by the requested instructions.

The court, in the twenty-sixth paragraph of its charge, instructed the jury that, although it found from the evidence that Matto had, for a period of time prior to his death, importuned and solicited the defendant to have intercourse with him, had offered her money, had written letters falsely accusing her of immoral relations with her cousin and others, and of having given birth to an illegitimate child, and had been guilty of other debasing and insulting conduct towards the defendant, these facts furnished no justification or legal excuse for the taking of his life by her. Exceptions were taken to this instruction, and an

3. HOMICIDE: justifiable or excusable: insulting conduct.

instruction presenting, if not the opposite theory, one that was widely different therefrom, was requested by the defendant. The instruction given is not open to the exceptions lodged against it, and the requested instruction is manifestly unsound, and should not have been given. All of the facts and circumstances shown in evidence touching relations of the deceased with the defendant were allowed to be considered by the jury, as bearing upon the question of her mental condition at the time of the shooting. They were, under the facts of this case, admissible upon no other theory or issue.

IV. Evidence was also offered upon the subject of the defendant's character as a peaceable and law-abiding citizen. An instruction stating the effect to be given this evidence was requested and refused. The subject was fully and fairly covered by the court's charge to the jury. Instructions defining insanity were also requested, and were refused by the court. This subject was likewise fully covered by the court's instructions.

V. A long hypothetical question was propounded to several medical witnesses on behalf of the defendant, and also a similar question embodying the theory of the State was asked by the county attorney, upon cross-examination. Some complaint is made of the ruling of the court upon objections made to the State's hypothetical question. The objections were without merit. The instructions of the court were in the usual form, and embodied all the essential requirements. We therefore find no reversible error in the court's charge to the jury, nor in the refusal to give requested instructions.

It would serve no useful purpose to extend this opinion by a further detailed discussion of the numerous errors assigned. The defendant had a fair trial. Her act could be excused only upon the ground of mental irresponsibility, and the evidence offered upon this point is neither of a persuasive nor a convincing character. It would have been wrong for the court to have submitted to the jury the issue of self-defense. The evidence did not justify it. Matto appears to have been a somewhat debased individual, and the defendant was, no doubt, greatly angered by his attentions and conduct toward her. The act of writing the letters to her brother-in-law and to her lover was

reprehensible in the extreme. So far as is disclosed by the record, the defendant was an intelligent and virtuous girl. Her act, however, in taking it into her own hands to redress her grievances against Matto cannot be excused or justified upon, any other theory than that of insanity. Upon this issue, the jury found against her. A careful and painstaking examination and review of the record satisfy us that the verdict is fully supported by the evidence, and that no reversible error is to be found thereon. The judgment of the court below is, therefore,— *Affirmed.*

WEAVER, PRESTON, and DE GRAFF, JJ., concur.