STATE OF IOWA, appellee, v. KENNETH LEE HODGE, appellant.

No. 49873.

(Reported in 105 N.W.2d 613)

OCTOBER 18, 1960.

REHEARING DENIED JANUARY 13, 1961.

Robert M. Stuart and John M. Peters, both of Council Bluffs, for appellant.

Norman Erbe, Attorney General, Marion R. Neely, Assistant Attorney General, and Kenneth Sacks, County Attorney, Pottawattamie County, for appellee.

THOMPSON, J.—On December 25, 1958, about 6:30 p.m., an employee of the operators of the Wilcox greenhouse, in Council Bluffs, found the dead body of Harry Minds, also an employee, in greenhouse No. 48. There is evidence that the deceased had been badly beaten about the head; one of the investigating officers testified there was a large hole in the top of the head and that much hair and portions of the skull were gone from the head. A piece of iron pipe about 31 inches long, bearing stains of blood and with hair attached to the bloody end, was found near by.

We shall not at this point go into a detailed recital of the facts shown in evidence. So far as they are material upon the errors assigned by the defendant upon this appeal, they will be related as we consider the various contentions made. It will be sufficient to say here that suspicion soon attached to the defendant and police officers visited his home. He was taken to the police station. Later the officers went to defendant's home again, and there found some clothing which he said was his. There is evidence the clothing was stained with human blood. The defendant was also an employee of the greenhouse, and had admittedly been there on the afternoon of December 25. He also admitted on the witness stand having a fight with Minds, and leaving him unconscious on the floor of greenhouse No. 48.

The defendant was detained in custody through December 26, and was questioned at various times and considerably by the county attorney and police officers. No charge was filed against him until December 27. In the meantime, and about

11:50 p.m. on December 26, he signed a confession in which he admitted hitting Minds on the head with a piece of pipe he had picked up, as Minds went down a set of steps ahead of him. He said he did not know how many times he struck Minds, but after the latter fell the defendant took his billfold from his left rear pocket and left. He took two dollars from the billfold and threw it away; later showing the police where he had thrown it, and it was recovered. The confession also admitted that the articles of clothing found by the officers at defendant's home were his, and that the pipe found in the greenhouse was the one with which he struck Minds.

I. The defendant's first assigned error is based upon the refusal of the trial court to give a requested instruction dealing with the weight and value to be given to character evidence. The requested instruction was this: "You are instructed that there is evidence presented by the defendant relative to his disposition and also as to his character and his peaceable disposition, and that such evidence may be considered by you as bearing upon the character and disposition of the defendant, and if such evidence is sufficient in your mind as to generate a reasonable doubt as to the guilt of the defendant, you may consider such evidence as permitting an acquittal."

The court gave its own Instruction No. 23 dealing with the subject. It is quoted: "The defendant has introduced testimony tending to show that his general reputation as being a peaceful and law-abiding person was good. This testimony is competent and should be considered by you in connection with all the other evidence in the case. It is not, however, a defense to crime actually committed, but it is a circumstance to be considered by you in connection with all the other evidence in determining the guilt or innocence of the defendant. It may be considered as tending to show that a man with such a reputation would not be likely to commit the crime charged. It should be given consideration irrespective of whether other evidence is conclusive or not, and it is for you to determine from all the facts and circumstances in the case what weight should be given to such testimony."

The defendant at this point relies much on State v. Fer-

guson, 222 Iowa 1148, 270 N.W. 874. We think the case does not go so far as the defendant contends. We there said that the challenged instruction was lacking, in certain essential elements. We said, at pages 1156 and 1157 of 222 Iowa, page 880 of 270 N.W.:

"Nothing is contained in this instruction as to the purpose for which this evidence may be considered. The jury is nowhere told that, if they find that the defendant's character for morality and honesty is good, they may consider such evidence in determining whether a man of such good character for morality and honesty would be apt to commit the crime with which defendant is accused. The jury is nowhere told that, if they find the defendant's character for morality and honesty to be good and, if in considering this evidence with other evidence in the case they entertain a reasonable doubt as to defendant's guilt because of his good character, they should acquit him."

■ The opinion then says that the law is well established that evidence as to good character may be considered by a jury with all the other evidence, and if it, with the other evidence, raises a reasonable doubt as to the guilt of the accused, it should acquit.

■ We find nothing here that is in conflict with Instruction No. 23 set out above, or which shows any omission of an essential element therefrom. It told the jury the evidence of good reputation as a peaceful and law-abiding citizen should be considered by it with all the other evidence in the case; and elsewhere the jury was told that it should try the case upon the evidence before it, with reasonable doubt being clearly defined. Instruction No. 23 also advised the jury it should consider whether a man with such a reputation would be likely or not to commit the crime charged. It was also told this evidence should be considered whether other evidence was conclusive or not. There is considerable discussion of the proper instruction as to evidence of good character or reputation in State v. Fador, 222 Iowa 134, 268 N.W. 625, and the instruction here given meets the tests there set up. In effect, Instruction No. 23 told the jury evidence of good reputation, while not a defense to a crime actually committed, should be considered in determining

the guilt or innocence of the accused; in other words, whether the crime charged was committed. It was also told it might consider whether a person of good reputation such as the defendant's was depicted to be would be likely to commit the crime of which he stood accused. The over-all effect of the instruction was that the evidence of good reputation should be taken with all other evidence in determining the guilt or innocence of the defendant, and the jury should give it such weight as it believed it should have. Of course this instruction was to be taken in connection with all other instructions in the case; and we think the jury could not fail to understand that this item of evidence was a part of all the evidence and should be taken into account with all other evidence in determining its verdict. We have set out above the omissions from the given instruction in the Ferguson case, supra. We think Instruction No. 23 here, fairly considered for what it says and with the other instructions given, meets all the objections found in Ferguson, and gave the defendant all he was entitled to have on the subject.

■ The requested instruction would have told the jury evidence of good character might generate a reasonable doubt of guilt. It nowhere refers to the other evidence in the case. In the Ferguson case the requested and refused instructions which we approved included the words "in connection with all the evidence" and "together with all the other facts in evidence." The requested instruction here went much further than the doctrine of the Ferguson case extends. In State v. Crisman, 244 Iowa 590, 598, 57 N.W.2d 207, 212, we quoted with approval from 20 Am. Jur., Evidence, section 1219, page 1073: "Such proof must be considered by the jury in connection with all the other testimony and not independently thereof, and the guilt or innocence of the defendant must be determined from all the testimony." We also quoted from State v. Fador, supra, language which is expressly applicable here: "we think the jury was clearly told and sufficiently understood from the instructions that if, considering all the evidence, including the evidence as to good reputation, they had any reasonable doubt as to the defendant's guilt, it was their duty to acquit him." See also State v. Donovan, 61 Iowa 278, 280, 16 N.W. 130, 131. The assignment is without merit.

II. Next the defendant complains of the admission of a purported confession, which he alleges was obtained in violation of his constitutional rights and of due process. It appears he was taken into custody—he was told the captain would like to talk to him and taken to the police station—sometime during the night of December 25–26 following the finding of the body of the deceased in the greenhouse. He was held there, with the exception of trips to his home and to the vicinity of the greenhouse, until December 27, when a preliminary charge of murder was filed against him in the Council Bluffs Municipal Court and he was arraigned. During this time he was questioned intermittently by the county attorney and various police officers; and about 11:50 p.m. on December 26 he made and signed the challenged confession. During this time he did not have the advice of counsel or, he asserts, an opportunity to procure one or to communicate with his wife. He testified that he was kept in a cell with only a steel shelf for sleeping, and was given nothing to eat. He says he was given coffee. There is substantial testimony from the police officers, however, that there was a mattress on his bunk and he was served regular meals. The trial court submitted the question of the voluntariness of the confession to the jury under instructions which are not challenged. There is a dispute in the evidence as to whether he read the confession after it was typed and before he signed it. His own testimony in the case tells of a fight with the decedent on the afternoon of December 25 at the greenhouse during which he struck Minds several times with his fists, in one of which he had a bolt taken from his car; and he also testified that Minds was lying, apparently unconscious, after the fight when the defendant left.

The defendant relies chiefly upon the fact that the defendant was held for some 24 hours without a charge filed or an arraignment before the confession was obtained. He cites Ashcraft v. Tennessee, 322 U. S. 143, 64 S. Ct. 921, 88 L. Ed. 1192; Chambers v. Florida, 309 U. S. 227, 60 S. Ct. 472, 84 L. Ed. 716; McNabb v. United States, 318 U. S. 332, 63 S. Ct. 608, 87 L. Ed. 819; State v. Archer, 244 Iowa 1045, 58 N.W.2d 44; and State v. Clifford, 86 Iowa 550, 53 N.W. 299, 41 Am. St. Rep. 518; the United States and Iowa Constitutions; and sec-

tion 758.1 of the Iowa Code, which requires that a person arrested without a warrant shall be taken without unnecessary delay before the nearest or most accessible magistrate and an affidavit showing the grounds for the arrest filed in the same manner as a preliminary information.

We held in State v. Archer, supra, that the circumstances there shown without dispute—in fact, many of them were testified to by the police officers—made the confession so tainted with evidence of its involuntariness that it should have been excluded as a matter of law. But we think the situation here is not comparable. In the Archer case the defendant was held for four days, during which time he was questioned by relays of officers; and when he denied his guilt he was accused of being a liar and urged to tell the truth. There was no other evidence to connect him with the crime; the situation was such that it appeared without contradiction the officers had conceived a theory and by a four-day process of inquisition had hammered out a confession to fit it.

The situation is different here. It does not fairly appear that the defendant was held solely for the purpose of obtaining a confession. There was other evidence connecting him with the crime; and while an involuntary confession should always be refused admittance, we think the fact that the defendant was held while an investigation of all the circumstances was being made does not in itself make the confession obtained involuntary so that the court should not have admitted it. There were suspicious circumstances tending to connect the defendant with the death of Minds; and it is not surprising that a reasonable time for investigation of the entire situation might elapse before a charge of murder was filed. We may assume that a magistrate was available on December 26, so that there was one day while defendant was being held when he could have been charged and arraigned. But as we said in State v. Archer, supra, page 1057 of 244 Iowa, page 50 of 58 N.W.2d: "True it is that peace officers, and prosecuting attorneys, must have some latitude in law enforcement * * *." We think such latitude was not transgressed here.

The fact that the defendant was held for some time

without charge or arraignment does not in itself make a confession involuntary, nor is it a denial of due process. We pointed this out in the Archer case, page 1058 of 244 Iowa, page 51 of 58 N.W.2d. The Federal Courts do not admit confessions obtained while a suspect is held without arraignment; but this is a rule of practice, which does not obtain in Iowa. Gallegos v. Nebraska, 342 U. S. 55, 72 S. Ct. 141, 96 L. Ed. 86; McNabb v. United States, supra. Such detention, as we said in the Archer case, is one of the indicia of undue pressure; but in and of itself it does not require exclusion of the confession. State v. Williams, 245 Iowa 494, 501, 62 N.W.2d 742, 746. Many of the statements testified to by the defendant in the instant case were denied by the police officers and county attorney. In Archer the material matters were admitted. We hold the question of voluntariness was for the jury, and find no error at this point.

█ III. Further error is predicated upon the refusal of the trial court to give an instruction which would have told the jury that the indictment returned against a defendant is not evidence against him and should not be considered as having any bearing on his guilt or innocence. At this point the defendant cites and relies upon Cooper v. United States, 8 Cir., Iowa, 9 F.2d 216. The contention is fully answered in State v. Sauerbry, 233 Iowa 1076, 1080, 1081, 10 N.W.2d 544, 546. There was no error in the refusal.

█ IV. Complaint is further made of the denial of defendant's objections to certain hypothetical questions asked by the State of an expert witness on rebuttal. It is contended the questions assumed facts not shown in evidence and invaded the province of the jury.

We shall not attempt to pass upon the merits of the controversy at this point. The examination related to the question of the defendant's sanity, and a later division of this opinion holds there was no jury issue on this point, and it should not have been submitted. Error against the State resulted. It follows that no prejudicial error could result from questions propounded by the State in rebutting what was thought to be evidence of insanity generated by the defense. It may be remarked in passing, however, that the trial court has considerable

latitude in passing upon hypothetical questions; In re Estate of Telsrow, 237 Iowa 672, 682, 22 N.W.2d 792, 798; Ranne v. Hodges, 181 Iowa 162, 177, 162 N.W. 803, 808; and that we think it is not asking too much of counsel who object to such a question on the ground that it contains statements not shown in the record to point out such statements rather than to rely upon a general objection which leaves the court to search an often long and involved question and then compare it with a record likewise often long. In re Estate of Telsrow and Ranne v. Hodges, both supra. Also, the objection that the question invades the province of the jury is generally not available in Iowa, since the decision in Grismore v. Consolidated Products Co., 232 Iowa 328, 348–362 inclusive, 5 N.W.2d 646, 655–663 inclusive.

V. Error is assigned because, although the indictment charged the defendant with murder committed in the perpetration of a robbery, the court instructed both upon robbery and attempt to rob, and told the jury it might find the defendant guilty if the killing was committed while in the perpetration of or attempt to perpetrate a robbery. The point lacks merit. There is but one crime of murder in Iowa. State v. Nutter, 248 Iowa 772, 775, 81 N.W.2d 20, 21. The indictment also charged the crime was committed in violation of section 690.2 of the Code, which includes both robbery and attempts to rob. This was sufficient. Section 773.3, Code of 1958. The question is fully answered in State v. Johnson, 72 Iowa 393, 400, 34 N.W. 177, 181. This holding was cited with approval and followed in State v. Tyler, 122 Iowa 125, 131, 97 N.W. 983, 985.

VI. A further assignment of error is based upon the court's Instruction No. 10, which the defendant thinks ignored his defenses by authorizing a conviction without referring to them. The instruction told the jury it might find the defendant guilty of either degree of murder "which is warranted by the evidence and the law given you in these instructions." Another instruction contained the usual statement that all instructions must be considered together, and that each instruction must be considered in the light of all the other instructions and in harmony with them. In State v. Wilson, 234 Iowa 60, 86–89 inclu-

sive, 11 N.W.2d 737, 750–752 inclusive, any reference to other instructions or to the law given by the court was lacking in the criticized instruction. The jury was merely told that if the State had satisfied it beyond a reasonable doubt of the truth of the material allegations of the indictment it might find the defendant guilty. The instruction in the case at bar is not vulnerable to the defect pointed out in the Wilson case, upon which defendant relies.

 VII. The court refused to give defendant's requested instruction, or any instruction, on self-defense; and this is thought to be prejudicial error. While the burden of proving beyond a reasonable doubt that the accused in a charge of illegal homicide did not act in self-defense is upon the State under the Iowa rule, it is also true that an instruction on self-defense is not required in every such case. It is only when the evidence raises a substantial issue of self-defense that an instruction on the subject need be given. State v. Moon, 241 Iowa 1232, 1236, 44 N.W.2d 739, 741; State v. Russo, 193 Iowa 992, 999, 188 N.W. 660, 663. We find no evidence of self-defense in the record before us. The defendant's confession says only that as the deceased went down the steps ahead of him, "I hit him on the back of the head with a piece of pipe I had picked up. I don't remember how many times I hit him."

As a witness for himself in the case, he testified that Minds said to him, "I think I will go and see your wife tonight"; although he then admitted he did not understand what Minds meant by the remark. But his further testimony is that he then slapped Minds, who "came at me swinging." He hit Minds with his left hand, in which he held a bolt out of his car. The fighting went on for a few minutes, and "Mr. Minds hit me at the side of the head once that I know of. I hit him seven or eight times with my hands, including the hand with the bolt in it. * * * I hit him in the side of the head and about the face. I saw he had a cut on the right side of his head from the bolt. I hit him hard enough to turn him half way around, and then hit him with a judo chop to the back of the head with my open hand. I learned that blow in the service. * * * the judo blow knocked him out."

This, in substance, is the defendant's courtroom version of the fight, if a fight it was. By his own account he was the aggressor; he struck the first blow. He did not retreat; he does not say he was in fear of death or any serious injury from Minds. His story indicates he had the upper hand of the struggle from the first. He continued to rain blows on Minds, inflicting severe punishment with a bolt which he was carrying. He closed the encounter with a "judo chop" which, he says, "knocked him out." Then he left the unconscious man and went home. This version is quite different from his confession account; but it furnished no basis for an instruction on self-defense.

VIII. Error is assigned upon the admission of the testimony of Sidney A. Cohen, a doctor who testified as to his findings upon an autopsy and the cause of death of the deceased. Doctor Cohen testified without objection that he performed an autopsy "on a person identified to me as Harry Minds." When he was asked to tell his findings, objection was made that the question was "incompetent, irrelevant and immaterial, no proper foundation having been laid, under the record and the present state any findings of the witness would be incompetent, irrelevant and immaterial." It is now urged that the statement that the body was identified to the witness as Harry Minds was hearsay. But this objection was not disclosed to the trial court. A general objection of "incompetent, irrelevant and immaterial", at least so far as it seeks to exclude claimed incompetent testimony such as hearsay, does not sufficiently advise the trial court of its real basis and furnishes no ground for assigned error on appeal. Ferris v. Riley, 251 Iowa 400, 408, 409, 101 N.W.2d 176, 180, 181, and cases cited. It is true that under section 793.18 of the Code we are required to examine the record and render judgment without regard to technical defects. But we are not impressed here with the thought that any harm was done to the defendant. Had the hearsay objection been specifically made the State might well have found another way of identifying the body which Doctor Cohen examined.

IX. Allison C. Semmes, a special agent and chemist employed by the Federal Bureau of Investigation, testified as

to bloodstains on clothing which police officers had found in defendant's home, and as to his tests of hairs attached to pieces of bone sent him and others found at the scene of the crime. At one point he referred to certain notes he had had in his pocket. Defense counsel demanded the right to inspect the notes, but the trial court, remarking that the witness had referred to the notes at only three points, to determine the slides on the three sets of hairs, denied the request. The ruling was within the discretion of the trial court. 58 Am. Jur., Witnesses, section 602, page 336; United States v. Socony-Vacuum Oil Co., 310 U. S. 150, 60 S. Ct. 811, 84 L. Ed. 1129; Phillips v. United States, C. C. A., 2 Cir., 148 F.2d 714, 717.

X. Error is predicated upon the admission of certain exhibits offered by the State. These consisted of clothing—shoes, trousers and a shirt—found by the officers in defendant's home shortly after the finding of deceased's body in the greenhouse; a broken flower box showing traces of blood and some hair, found at the greenhouse; an envelope, containing some hair and bone, which the evidence showed was found at the death scene; and two slides with some hair, offered in connection with the examination of the witness Semmes, the F. B. I. agent. The defendant seems to be making two complaints about these items of evidence: that they were not properly identified, and that in any event they are not shown to be connected with the crime alleged. Without detailing the processes involved we content ourselves with saying we think the identification of each item was sufficient. As to the connection with the charged crime, it appears the clothing was found in defendant's home, there is evidence it belonged to the defendant, and the several articles bore human bloodstains. The flower box was found near Minds' body, was bloodstained and had a trace of human hair. There is evidence that the hair and bone found in the envelope were picked up also in the greenhouse near the body and that hair and part of the skull were missing from Minds' head. The two slides served to identify some of the hair found as human hair. The evidence made by the exhibits was admissible. See State v. Bales, 246 Iowa 446, 450, 451, 68 N.W.2d 95, 97, 98. In view of defendant's confession and other evidence tending to connect

him with the crime, his bloodstained clothing was surely proper evidence. The flower box and the hair and bone in the envelope were found near the dead body and tend to show a violent death and to explain the circumstances surrounding it. No error appears.

XI. Instructions bearing on the question of insanity are challenged by the defendant and error is assigned. Instruction No. 17 properly told the jury that the law presumes a person to be sane and the burden of proving insanity is upon the defendant to so show by a preponderance of the evidence. But the court then told the jury:

"If you find beyond a reasonable doubt that the defendant, Kenneth Lee Hodge, killed the said Harry Minds and you find by a preponderance of greater weight of the evidence that his act was caused by mental disease or unsoundness which destroyed his reason and judgment with respect to the act which destroyed his power rationally to comprehend the nature and consequence of the act, and which overpowering his will irresistibly forced him to do it, then he is not amenable to legal punishment and your verdict should be not guilty."

We commented on a substantially identical instruction in State v. Beckwith, 242 Iowa 228, 244, 245, 46 N.W.2d 20, 29. There we attempted to give warning that it should be used only with caution and in exceptional cases. We said:

"It occurs to us that this form of instruction might be serious error in some cases, as where the defendant made a sufficient showing of lack of comprehension, but showed no irresistible overriding of the will. Such an instruction might place an undue and unlawful burden upon the defendant."

We found no error in the Beckwith case because the evidence was that the defendant, if insane, was made so by an irresistible impulse which destroyed his reason and his comprehension of right and wrong. It is only in such cases that the instruction can be justified. Its vice, in the usual case, is that it requires a finding both of lack of comprehension of consequences, which we have held is the true test of insanity in Iowa, and of an irresistible impulse.

So in the case at bar, taking the instruction for

what it says, the jury might have found lack of "comprehension of consequences" and still have been compelled to find the defendant sane because there was insufficient evidence of "irresistible impulse." The submission was in the conjunctive, using the word "and." As applied to the facts of this case the instruction was in error. Since we are committed to the "comprehension of consequences" or knowledge of right-and-wrong test in Iowa, and do not recognize the "irresistible impulse" theory, we see no reason for an instruction which refers to the latter in the absence of some special feature of the evidence. It will often create prejudicial error. See State v. Beckwith, supra, 242 Iowa 228, 245, 46 N.W.2d 20, 30. Generally, an instruction given in the conjunctive as the court did here—comprehension of consequences *and* irresistible impulse—will throw an undue burden on the defendant and so create error. If given in the disjunctive—comprehension of consequences *or* irresistible impulse—it will permit the defendant to show insanity by a test not recognized in Iowa, and so be error against the State. There may be cases in which, because of the nature of the evidence, a reference to the "irresistible impulse" theory is permitted, as in State v. Beckwith, supra; State v. Buck, 205 Iowa 1028, 1039, 1040, 219 N.W. 17, 19, 20. But these must be recognized as exceptions.

■■ However, we think it error without prejudice. In jurisdictions which, as Iowa, start with a presumption of sanity and place the burden of showing insanity by a preponderance of the evidence upon the defendant, it is well established that the issue of insanity should not be submitted, when the claimed insanity is temporary or intermittent, unless the evidence establishes the criminal act was not committed in a lucid interval. It is said in 22 C. J. S., Criminal Law, section 584, page 901: "Where it is shown that accused had lucid intervals, it will be presumed that the offense was committed in one of them." We ourselves have held that the defense of insanity need not be submitted to the jury, when there is no substantial evidence to overcome the presumption of sanity. State v. Brewer, 218 Iowa 1287, 1295, 254 N.W. 834, 838. We there said: "It is not claimed that the defendant's mental seizures were either progressive or continuous. The record is absolutely barren of any

fact or circumstance from which it can be inferred that at the time of the crime the defendant was under the influence of his mental ailment."

Of course where there is substantial evidence of insanity at the time of the commission of the offense charged, the question should be submitted to the jury under proper instructions. But here, as always in our procedures, both civil and criminal, there must be such evidence. The burden being upon the defendant to prove insanity which operated at the very time of the alleged criminal act, he must produce evidence thereof; and this is especially true when his own testimony is that he knew what he was doing and appreciated the difference between right and wrong. We turn to the evidence introduced.

Dorothy Leona Hodge, the wife of defendant, with whom he was residing in Council Bluffs at the time, testified that on December 25, 1958, the day of the killing, at lunch time "he had a strange look like somebody that is drunk has in his eyes. * * * He told me the car was somewhere over on Eighth Street and then he said it was at the greenhouse." She further said that when she saw the defendant about 1:30 p.m. at the police station on December 27 next, "I noticed that his eyes were the same as they were on Christmas; kind of like a person drunk or starey eyed." During the examination of this witness, in response to an inquiry by the court, defendant's counsel said that no contention was being made that the defendant was insane at the time of the trial so he was incapable of conducting his defense. Mrs. Hodge further said that on two occasions, about two and one-half years before, the defendant had suddenly stopped talking and started choking her. At those times he looked "starey-eyed." Later he denied the chokings. No complaint was made to the authorities.

Mary J. Rudd, mother of the defendant, testified in 1934, when defendant was four years of age, he had infantile paralysis, which affected his hands, his speech and one foot. She saw him at the city jail in Council Bluffs on December 27, about 4 p.m. "He seemed more like a crazy person at that time. I noticed he was skinny, but he said he was fat. He said his clothes were tight but a man weighing 300 pounds could have

worn the coveralls. In my opinion when I saw him on December 27, 1958, he was of unsound mind at that time."

Sam Gibbs, operator of a service station in Council Bluffs, knew the defendant. The defendant was at Gibbs' filling station on December 24, 1958, from about lunch time until dark. "He had a glassy, starey look. He sat in the corner and was just more or less in a blank state of mind. * * * Normally he would carry on a conversation, but that day he sat there and didn't say three words the whole afternoon. * * * he helped me change the license plates on my car and my wife's car. In my opinion he did not act right and sat there in a daze. In my opinion I do not think he was of sound mind at that time." On cross-examination the witness said "I do not think he was of sound mind at that time because of his actions and his looks. He was more like a man that had been drugged or in a trance and his eyes were glassy. I asked him if he was sick and he didn't answer me." On redirect he testified that the defendant had told him that he had terrific headaches and "at times that he blacks out, that he don't see, that he doesn't remember what he did do."

The evidence above referred to, with defendant's own testimony, makes whatever case he has for a submission of the insanity issue. Standing alone, what we have detailed above would make a close question on submission. But, keeping in mind that the defendant had the burden to show lack of comprehension of right or wrong at the time of the killing, we think his own testimony makes it clear there was no jury question. It is true he told of being wounded while in the service in the Korean war, sustaining head and other injuries which hospitalized him for some four months; and that since he has had severe headaches which "make me feel weak and dizzy." But any effect of this testimony and of that of his wife, his mother and of Sam Gibbs is destroyed by his detailed and precise account of what happened on December 25, before and during his stay at the greenhouse, and of his difficulty there with the deceased. He told of driving his car to the greenhouse at 2 a.m. on December 25, apparently after some dissension with his wife over Christmas presents. He went to sleep in the grading shed at the greenhouse. His car would not start and he worked on it until

about noon, then walked home, about one and one-half mile, and ate "dinner." His wife, sister-in-law and the three children were there. He was home about 45 minutes, then walked back to the greenhouse. He worked on his car from one-half hour to an hour, and "at the time I had a momentary blackout. I just lost all of my senses momentarily as I was sitting in the front seat of my car. * * * After the blackout I felt dizzy and nervous and didn't want to be by myself so I went up to greenhouse 40, the carnation house. I found Harry Minds working there, and sat down and talked to him for a half hour. At that time I felt nervous, dizzy and upset in my stomach." He further said he told Minds he could not get his car started, and Minds said if defendant would help him check the temperatures he would push the car to see if it would start.

He then helped Minds check the temperatures in the green-houses and raise and lower the air vents. This took about an hour. Then he testified Minds "made a wisecrack there in the greenhouse." Minds said " 'I think I will go and see your wife tonight.' " The further testimony of defendant is that when Minds made this remark defendant slapped him:

"He came at me swinging. He was trying to hit me, and I was mad. I had a bolt out of my car which I had in my left hand. * * * The fighting went on for a few minutes and Mr. Minds hit me at the side of the head once that I know of. I hit him seven or eight times with my hands, including the hand with the bolt in it. * * * I hit him in the side of the head and about the face. I saw he had a cut on the right side of his head from the bolt. I hit him hard enough to turn him half way around, and then hit him with a judo chop to the back of the head with my open hand. I learned that blow in the service. The fight took place in greenhouse 48, and the judo blow knocked him out." (Much of this testimony we have previously set out in connection with the claimed issue of self-defense.)

"During the fight with Mr. Minds on December 25, 1958, after I knocked Mr. Minds out, he fell down with his feet to the north and the upper part of his body on some boards. The right side of his head was down with his cheek resting against the boards. When I hit Mr. Minds with the bolt in my hand

it caused a deep cut on his forehead which was bleeding quite a bit. * * * After he fell down I stood there a minute or two to see if he was going to get up and then started back out of the greenhouse. I looked down to the ground and in the walkway I saw a billfold which was the same color as mine and which I thought was mine. At that time I felt dizzy and like a drunk person and had an upset stomach."

The witness then told of picking up the billfold and looking to see if his Army discharge papers were in it, saw it was not his and threw it away. He says "I was scared and nervous." He went on to deny hitting Minds with the pipe of which he had told in his confession and which was in evidence as Exhibit 9. He said he had nothing in his hands except the bolt, and that he did not have a bloodstained flower box which was put in evidence by the State in his hands at any time, and did not see it at the greenhouse. Next he told in detail of his actions after he reached his home, including changing his clothes and washing his hands and face, putting the clothing in the back room of the house, going to a service station for kerosene, stopping at a café for milk, taking care of the children, eating his supper and going to sleep.

We have gone into considerable detail with the defendant's own testimony because it seems to make it clear beyond question that he knew what he was doing at all times before, during and after the altercation with Minds; except that he had a "blackout" an hour or so before. This, however, was only momentary, and had long passed away before the trouble arose. The story told by the defendant from the witness stand is materially different from the manner of the occurrence as related in his confession, which makes the killing of Minds a cold-blooded assault with an iron pipe for the purpose of robbery as Minds was walking ahead of him in the greenhouse; and the wounds on Minds head strongly bear out the confession account. But we are not concerned with the manner of the killing at this point. Often the accused in this class of cases, where insanity is relied upon as a defense, claims that he does not remember the occurrence; that "everything went black." Not so here; there is no word in the defendant's testimony to indicate he did not know

at all times what he was doing and why. If his witness stand version is to be believed he was incensed because Minds made a slighting reference to defendant's wife, and assaulted him because of it. He knew every detail of the fighting and what he did immediately after. It is true he said that immediately after he had knocked Minds out he felt dizzy and like a drunk person and had an upset stomach. This, however, does not show insanity. It might well be only the normal reaction of a person to a hard fistic encounter.

The case is strikingly like State v. Brewer, supra. There, as here, the defendant, while asserting insanity as a defense, and with a considerably stronger showing than in the case at bar, testified as to the manner of the fatal shooting and we said: "It is not claimed that the defendant's mental seizures were either progressive or continuous. The record is absolutely barren of any fact or circumstance from which it can be inferred that at the time of the crime the defendant was under the influence of his mental ailment. The evidence of the defendant establishes clearly that he was quite calm and collected at the time of the fatal occurrence. * * *." The opinion then goes on to relate parts of the defendant's testimony which showed his knowledge of what he was doing and understanding of the meaning of his acts. State v. Brewer, supra, 218 Iowa 1287, 1295, 254 N.W. 834, 838.

The significance of the foregoing discussion lies in the fact that the erroneous instruction which the court gave on the question of insanity was not prejudicial to the defendant. Since he was not entitled to have the question submitted in any form, he cannot complain of error in the instruction. The error was against the State. The point is not clearly argued by the State, but we have often held that, while we may not reverse on points not stated, or argued, we will affirm if the record shows any sound basis therefor. Stover v. Central Broadcasting Co., 247 Iowa 1325, 1330, 1331, 78 N.W.2d 1, 4, and citations. Other objections to the instruction on insanity must fall for the same reason set forth above.

In passing, it is worthy of comment that the record shows no compliance by the defendant with section 777.18 of the Code,

which provides that notice must be given when the defendant proposes to use insanity as a defense. However, the point was not raised below, and the case was tried by the State without objection. Accordingly we have considered it without reference to the cited section.

Counsel for the defendant, although serving by appointment by the court, have labored with great skill and diligence to protect their client's rights. They have presented numerous questions requiring much study and research. They have made sure that every proper legal effort has been made in the defendant's behalf, in the interest of seeing that he had a fair trial. The able and experienced trial court was also meticulous in protecting the rights of the accused. We have examined the entire record carefully in compliance with the mandate of section 793.18, supra, and find no error. The defendant was accorded a fair trial in every respect.—Affirmed.

All JUSTICES concur.